UNITED STATES of America, Appellee,

v.

Ignacio PEREZ, Appellant.

UNITED STATES of America, Appellee,

v.

Luis QUINTERO, Appellant.

Nos. 82–1196, 82–1197.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 14, 1982.

Decided March 4, 1983.

Martin, Bahn & Cervantes, James M. Martin, John Malec, St. Louis, Mo., for appellants.

Thomas E. Dittmeier, U.S. Atty., James E. Crowe, Jr., Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before BRIGHT and McMILLIAN, Circuit Judges, and HARRIS,* Senior District Judge.

BRIGHT, Circuit Judge.

Ignacio Perez and Luis Quintero appeal their jury convictions for drug-related offenses. The jury convicted Perez of conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1976), and

---

* OREN HARRIS, United States Senior District Judge, Eastern and Western Districts of Arkansas, sitting by designation.

of two counts of illegally distributing cocaine, in violation of 21 U.S.C. § 841(a)(1) (1976). The jury convicted Quintero of conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1976), illegally distributing cocaine, in violation of 21 U.S.C. § 841(a)(1) (1976), and travelling in interstate commerce to promote the distribution of cocaine, in violation of 18 U.S.C. § 1952(a)(3) (1976). For the reasons outlined below, we affirm in part, reverse in part, and remand to the district court for a determination whether the illegal entry into the Perez home tainted certain evidence later seized pursuant to a search warrant.

I. *Background.*

Perez is a Venezuelan national who came to the United States several years ago to pursue advanced studies in civil engineering. In the fall of 1980, Perez met Marshall Jainchill, an owner of a delicatessen in downtown St. Louis. They became friends and purportedly used cocaine at their social gatherings. At one of these parties during the fall of 1980, Perez introduced Jainchill to Luis Quintero, whom Perez described as a friend from Venezuela. In that meeting, Perez, interpreting for Quintero, told Jainchill that Quintero travelled regularly to this country and brought a pound of cocaine each time. Perez stated that Quintero either carried the cocaine in a special suitcase or would travel with a woman who would body carry it. Perez told Jainchill that "there was money to be made" by selling cocaine.

In the ensuing months, Jainchill and Perez continued their association on essentially the same social basis. In mid-June 1981, Perez advised Jainchill that Quintero was coming to St. Louis. On the evening of June 16, 1981, Jainchill went to the Perez house and obtained one ounce of cocaine from Perez in repayment of a $1,500 loan made by Jainchill to Perez. Earlier that evening, Quintero had arrived in St. Louis with a female companion, Grecia Banados-Zavelata (hereinafter referred to as Banados). Although Quintero and Banados were at the Perez house during Jainchill's visit, Jainchill did not meet them at that time.

The next morning, at Jainchill's apartment, a government informant introduced Jainchill to an undercover drug agent, Detective Peter Gober of the St. Louis Metropolitan Police Department. Jainchill sold the one ounce of cocaine previously received from Perez to Detective Gober for $2,300. After buying the cocaine, Detective Gober questioned Jainchill about a larger purchase. Jainchill told Detective Gober that his source was a Venezuelan living in St. Louis whose friend brought about one pound of cocaine into this country each month from Venezuela. Detective Gober and Jainchill discussed larger purchases several times in the next few weeks, but had no contact for one month while Jainchill vacationed in Canada and the eastern United States.

On August 18, Perez told Jainchill that Quintero was to arrive in St. Louis that night, and that he could sell Jainchill two ounces of cocaine. They agreed to meet at St. John's Mercy Hospital in suburban St. Louis in the early evening to see Perez' new baby. Jainchill met Perez in the hospital room of Perez' wife at 6:30 p.m. At that meeting, Perez told Jainchill that Quintero was delayed but that Jainchill could buy three ounces of cocaine for $6,300. Jainchill telephoned Detective Gober from the hospital lobby and advised Gober that Quintero would not be in town until the next evening. Jainchill further agreed to sell Gober three ounces of cocaine for $7,100.

Quintero and Banados flew together from Caracus, Venezuela, to New York City on August 19, arriving in New York at 2:00 p.m. At that point, Perez informed Jainchill that Quintero was on his way to St. Louis. Jainchill conveyed this information by telephone to Detective Gober and told Gober that he would have the cocaine by 10:00 p.m. Later that day, Quintero and Banados flew from New York to St. Louis, arriving in St. Louis at 10:10 p.m. At about 10:15 p.m., Perez drove to the airport, picked up Quintero and Banados, and drove them back to his house. They arrived at the Perez home about 10:45 p.m At approximately 11:00 p.m., Jainchill called Per-

ez. Perez asked Jainchill if he wanted to "play racquetball." Jainchill took this as an indication that the cocaine was available. At 11:05 p.m., Jainchill telephoned Detective Gober, asked him if he wanted to play racquetball, told Gober he had to "pick up [his] racquet," and advised Gober to meet him at Jainchill's apartment at 12:30 a.m. Jainchill then proceeded from his apartment to the Perez house, where Jainchill arrived at 11:30 p.m. Once inside the house, Jainchill met with Perez and Quintero. Some ten minutes after Jainchill's arrival, a light brown Oldsmobile Cutlass arrived at the Perez house. The driver, who was subsequently identified as Thomas Groll, went into the Perez house.

Jainchill left the Perez residence at 11:50 p.m. and arrived at his apartment at 12:20 a.m. on August 20. There Jainchill met with Detective Gober and offered him the two baggies of cocaine. Gober "flashed" the "buy money" and placed Jainchill under arrest. Jainchill immediately cooperated with the agents. He told them that he had just bought the three ounces from Perez and Quintero. The agents questioned him about the brown Oldsmobile. He told them "Tom" was there to buy "ten ounces." Detective Hegger telephoned this information to the surveillance officers outside the Perez house. Shortly thereafter, Groll drove away from the Perez house in the brown Oldsmobile. The police arrested Groll a short distance from the house.

At about 1:00 a.m. and within minutes after Groll's arrest, Perez and Quintero left the Perez house in Perez' car. Police arrested Perez and Quintero about one-half mile from the Perez house.

Following the arrest of Perez and Quintero, police detectives returned to the Perez house. Upon entering the house, the agents swept through its rooms. They discovered Banados sleeping in a guest room, and took her into custody. Two agents remained in the house to secure the premises.

The police obtained a search warrant for the house some eleven hours later (at about noon) and executed the warrant at 2:30 p.m. that same day. Thus, agents remained in the house for thirteen and one-half hours until the house was searched pursuant to a search warrant. The execution of the warrant at the house revealed the following evidence:

1. A white purse on the night table next to Banados' bed containing a yellow "Taylor Publishing Company" envelope in which $21,000 in cash was found. It was later determined that fifteen of the $100 bills found in that purse were used by Detective Gober as "buy money" in his purchase of one ounce of cocaine from Jainchill on June 17;

2. A brown leather bag found on the bed in the master bedroom containing airplane tickets and passports in the names of Banados and Quintero. The tickets reflected their trip from Caracas to New York to St. Louis on August 19;

3. A nylon suitcase in the closet of the master bedroom containing a triple-beamed balance scale and parts to a Deering grinder;

4. Drug paraphernalia in the living room, including a "snorting" tube, a small cutting mirror and a Deering grinder.

After a grand jury returned indictments against Perez and Quintero, both defendants moved to suppress the evidence seized from the Perez house pursuant to the search warrant. The district court denied the motions. On January 29, 1982, the court entered judgments on the guilty verdicts, and sentenced Perez to an aggregate of seven years' imprisonment and Quintero to an aggregate of eight years' imprisonment. Both Perez' and Quintero's terms of imprisonment are to be followed by a special three-year parole term. These appeals followed.

II. *Discussion.*

A. *The Search of the Perez Home.*

Initially, the Government attacks the standing of Perez and Quintero to contest

the admission of certain items of evidence the district court failed to suppress. The Government asserts that Quintero is not entitled to an expectation of privacy in every corner of the Perez home. For example, the Government contends that Quintero was not entitled to an expectation of privacy in those items claimed by Perez.[1] Moreover, the Government argues that neither Perez nor Quintero can assert a legitimate expectation of privacy in those articles belonging to Banados.[2] We reject the Government's argument on this issue.

■ The touchstone of a standing requirement to assert a fourth amendment challenge is whether the individual had a legitimate expectation of privacy in the area searched. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980). The *Rakas* decision indicates that the Supreme Court would now deny standing to a "casual visitor" to a house that is searched if the visitor has never been to a room searched, or was in the room only one minute before the search began. *Rakas v. Illinois, supra,* 439 U.S. at 142, 99 S.Ct. at 430.

■ In the case at bar, however, the evidence indicates that Quintero and Banados were not "casual visitors" within the meaning of *Rakas.* They were out-of-town visitors who arrived with luggage to stay at the Perez home as overnight guests. When Perez and Quintero left to go out early in the morning of August 20, Quintero left all of his personal effects at the Perez house, along with his sleeping girlfriend. Quintero had every right to expect that his property, left at the Perez home, would be free from any unwanted intrusion. Moreover, Quintero also possessed a legitimate expec-

tation of privacy in the bags belonging to Banados. Quintero's money and plane tickets were found in Banados' bags, and the evidence indicates that they travelled together. Additionally, there is no evidence to show that Quintero was restricted from using any room in the Perez house. It is therefore reasonable that Quintero be afforded the legitimate expectation of privacy in the entire home.

■ Finally, we hold that Perez had a legitimate expectation of privacy in items seized belonging to Banados and Quintero. Perez should have been able to expect that any personal property brought into the house by his overnight guests would be free from government intrusion. None of the authorities cited by the Government stands for the proposition that a defendant may not assert fourth amendment rights to property seized from his own home.

Accordingly, we hold that both Perez and Quintero had standing to challenge the seizure of all of the items taken from the Perez home.

■ Perez and Quintero contend on appeal that the warrantless entry by police agents into the Perez house at 1:00 a.m., and the securing of those premises for thirteen and one-half hours until a search warrant could be obtained, was unlawful and violated their fourth amendment rights. Perez and Quintero conclude that the evidence seized pursuant to the warrant should therefore have been suppressed.

The Government argues that exigent circumstances justified securing the Perez house pending application for a warrant. Essentially, the Government asserts that the delay attendant upon obtaining a search warrant seriously threatened the integrity of any remaining cocaine in the Perez house.[3] The Government observes that Ba-

---

1. Perez claimed the paraphernalia found in the living room and the grinder and scale found in the canvas suitcase in the master bedroom closet.

2. The articles belonging to Banados were the brown shoulder bag and the white purse and contents. The white purse contained money and the brown bag contained plane tickets.

3. At about midnight on August 19–20, the Assistant United States Attorney estimated that it would take four-to-five hours to put search warrant papers together for a search of the Perez home.

nados remained in the house after police arrested Quintero and Perez. Consequently, the Government argues, the police were justified in fearing that Banados would become suspicious when her friends did not return, and destroy any remaining evidence. We reject this argument, and hold that no exigent circumstances existed in this case.

The United States Supreme Court has long held that the rule of exigent circumstances provides the basis for a "few specifically established and well-delineated" exceptions to the warrant requirement. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The destruction of evidence has been used to justify warrantless searches of homes as an exigent circumstance. We have held that "[t]he presence of evidence reasonably believed to be in imminent danger of removal or destruction is well recognized as a circumstance which may permit immediate police action." *United States v. Kulcsar,* 586 F.2d 1283, 1287 (8th Cir.1978). We have more recently stated that "[t]o justify a warrantless entry based on imminent destruction of evidence, factual circumstances must demonstrate a sufficient basis for an officer to believe somebody in the residence will likely destroy evidence." *United States v. Beck,* 662 F.2d 527, 530 (8th Cir. 1981).

■ In order to ascertain whether a warrantless entry was justified in this case, we must consider the total situation confronting the officers. After reviewing the record, it is evident to us that all the facts available to the police in this case did not justify a warrantless entry. The police had no evidence that Banados was involved in drug dealing, or that she knew or even had reason to know that Perez and Quintero had been arrested. For example, no evidence exists of a callback arrangement between Banados and Quintero or Perez.[4] Moreover, the police obtained no evidence that Banados was planning on taking action to destroy any evidence in the house. The only fact the agents asserted to support their entry was their fear that evidence would be lost. Mere fear or apprehension alone that evidence will be destroyed will not justify a warrantless entry of a private home. An officer may not substitute hindsight for prior knowledge that a defendant or his associate is really in a position to destroy the evidence. *See United States v. Levine,* 500 F.Supp. 777, 780–81 (W.D.N.Y. 1980).

■ The Government offers an alternate ground under the fourth amendment to justify the admission of the items ultimately seized. The Government asserts that even assuming that the initial entry into and seizure of the house was illegal, the evidence seized pursuant to the search warrant was not tainted because no information gained from the holding of the house was used in procuring the search warrant. *See United States v. Beck, supra,* 662 F.2d at 530. In *Beck,* this court concluded that a search warrant based on probable cause as supported by facts "untainted" by the prior illegality constitutes an "independent source" for seizing the evidence sought to be suppressed. *Id.* at 530. The *Beck* case stands for the proposition that there is no exploitation of the illegal entry where a subsequent detailed search is supported by probable cause established wholly apart from the information gained by that entry. Our review of the record reveals that it remains unclear whether information gathered during the initial illegal entry into the Perez home was subsequently used to procure the search warrant.

The district court made no specific finding or determination on this issue. The court merely denied the defendants' suppression motion without any opinion. We therefore have no way of knowing the basis for the denial of the suppression motion or whether the district court considered the alternate ground submitted by the Government. We therefore remand this case to the district court on this issue to determine

---

4. A callback arrangement is an agreement between participants in a drug transaction to telephone an all-clear message if everything proceeded smoothly after a sale.

whether the search warrant and the seizure of evidence pursuant to that warrant was tainted by the initial unlawful entry into the Perez house.

### B. Expert Testimony.

■ Perez and Quintero assert that the trial court erred in permitting testimony that trace amounts of substances recovered from items seized from the Perez house contained "cocaine" when the same witness conceded that he was unable to ascertain whether the "cocaine" present was a controlled substance within the meaning of the Drug Abuse Prevention Act, 21 U.S.C. § 812(c) (1976). The defendants note that there is a type of cocaine which is not a controlled substance, and thus not illegal to possess. They argue that, based on the testimony given, there is no way to know whether the substances gleaned from the exhibits were controlled substances.

We hold that the trial court properly permitted this testimony into evidence. While the testimony of the Government chemist on the difference between L-cocaine, a type of cocaine which is a controlled substance, and other cocaines, which are not controlled substances, was never particularly well explained,[5] the Government chemist did testify that all of these exhibits contained insufficient chemical material to perform tests necessary to determine that the chemical on each item was a controlled substance. As such, the expert's

testimony was not prejudicial to the defendants.

### C. Jury Instructions.

■ Perez and Quintero also assert that the trial court failed to instruct the jury properly on the Government's burden in proving that a controlled substance was present. They argue that the trial court incorrectly defined the controlled substance, leaving the jury with a confusing and ambiguous charge. We hold that the district court correctly instructed the jury that L-cocaine was a controlled substance as a matter of law, and that it was the jury's decision as to whether the substances in question consisted of "L-cocaine."[6] The trial court had earlier correctly instructed the jury that the Government must prove all elements of a crime beyond a reasonable doubt. The trial court therefore made a proper and sufficient charge to the jury on this issue. See United States v. Luschen, 614 F.2d 1164, 1169 n. 2 (8th Cir.), cert. denied, 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980).

### D. The Travel Act Conviction.

■ Quintero argues that there is insufficient evidence to sustain his conviction under the Travel Act. A violation of the Travel Act requires proof of interstate travel or use of an interstate facility, with intent to promote an unlawful activity, and an overt act in furtherance of the unlawful activity. 18 U.S.C. § 1952(a)(3).[7] See also

---

**5.** As the district court observed:
it was never really clearly explained to a layman, the jury itself, the real difference between L-cocaine and the other cocaines that were not likely to create the kind of psychological and other physiological * * * effect and it wasn't clearly explained I think to me or to the jury.

**6.** The court instructed the jury as follows:
You are instructed as a matter of law that L-cocaine is a Schedule II narcotic drug controlled substance. You must ascertain whether or not the material in question in counts II, III and IV was, in fact, L-cocaine. In so doing, you may consider all evidence in the case which may aid the determination of that issue, including the testimony of any expert or other witness who may testify ei-

ther to support or to dispute the allegation that the material in question was L-cocaine.

**7.** 18 U.S.C. § 1952 provides in part:
(a) Whoever travels in interstate * * * commerce or uses any facility in interstate * * * commerce, including the mail, with intent to—
    *      *      *      *      *      *
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

*United States v. Tavelman,* 650 F.2d 1133, 1138 (9th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982); *United States v. Wander,* 601 F.2d 1251, 1258 (3d Cir.1979). One isolated incidence of criminal activity, even though involving interstate commerce, is insufficient to sustain a Travel Act conviction. There must be evidence of a continuous enterprise and at least one act in interstate commerce in furtherance of that enterprise. *United States v. Tavelman, supra,* 650 F.2d at 1140; *United States v. Donaway,* 447 F.2d 940, 944 (9th Cir.1971). *See also United States v. Teemer,* 214 F.Supp. 952, 958 (W.D.W.Va. 1963) ("the Act was designed to attack an entrenched operation rather than a sporadic poker game or a floating crap game. No act of travel is to be deemed unlawful unless the enterprise is a continuing one * * *.").

■ In the case at bar, we hold that the evidence fails to show that Quintero engaged in a continuous course of conduct involving the distribution of cocaine. The best that can be said of the Government's evidence relevant to the travel count is that it established that Quintero had travelled to the United States from Venezuela on several occasions. The Government produced customs inspectors and submitted exhibits showing that Quintero made trips to the United States between November 1980, and August 1981. Although Jainchill gave testimony implicating Quintero in activity related to interstate transportation of narcotics, Jainchill based his testimony on alleged statements by Perez. The Government produced no direct evidence that Quintero brought drugs into the country on any specific occasion or brought drugs into the country as a continuous course of conduct. Without evidence of at least one prior cocaine transaction implicating Quintero, the Government could not establish a continuous course of conduct. A conviction under the Travel Act cannot, therefore, be sustained. *Cf. United States v. Kaiser,* 660

F.2d 724, 731 (9th Cir.1981), *cert. denied,* 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 (1982) (evidence of repeated sales of heroin was sufficient to establish a continuous course of criminal conduct for the purpose of Travel Act conviction). Accordingly, we reverse Quintero's conviction on the Travel Act count.

### E. *Closing Argument.*

Perez and Quintero argue that the district court erred in denying their motion for mistrial based upon comments by the prosecutor in closing arguments. Perez and Quintero cite as reversible error the prosecutor's reference on rebuttal to Perez' and Quintero's failure to substantiate their claimed impeachment of Jainchill as a drug dealer and to Perez' and Quintero's use of only part of a police report for impeachment.

The Government's argument on rebuttal concerning the defendant's lack of impeachment witnesses replied to the defendants' theory that Jainchill travelled to the Bahamas and New Orleans to obtain cocaine. While Jainchill admitted making single trips to each of those places in the year prior to his arrest, nothing in the record reflects his participation in drug activity there. Perez' and Quintero's counsel recited the names of thirteen people to Jainchill and suggested that he had sold drugs to them. However, defense counsel failed to call any witnesses to impeach Jainchill's testimony. The Government's attorney during final argument stated in part:

> They have a lot of innuendo in the course of their cross-examination of Marshall Jainchill, names all over the lot. "Do you know this guy? Why did you call that guy?" Well, you know what? They have to have some evidence too. They just got put in a situation where it's put up or shut up and they didn't put anything up there—
>
> Mr. McAvoy: Your Honor, I'm going to object to that. The law is very clear that we have no burden to do anything.

(b) As used in this section "unlawful activity" means (1) any business enterprise in-

volving * * * narcotics, or controlled substances * * *.

The Court: Well, I overrule the objection.

■■■ We reject Perez' and Quintero's assertion on this issue. In a proper case, government counsel may comment upon a defendant's failure to produce witnesses on impeachment matters. *United States v. Thompson*, 490 F.2d 1218, 1221 (8th Cir. 1974). In addition, the district court properly instructed the jury as to the Government's burden, noting that the law does not require a defendant to call witnesses on his behalf. Reviewing the record as a whole, we conclude that the prosecutor's statement in question did not prejudice the defendants' case.

■■■ The prosecutor's final argument also referred to police reports which were not introduced into evidence.[8] To the extent that the argument related to matters not in evidence, the district court sustained the objection of defense counsel and subsequently instructed the jury that argument of counsel was not evidence. In the context of an eight-day trial, it can hardly be said that the comment in question had any real effect on Perez' and Quintero's right to a fair trial. We therefore reject their contention in this regard. *Cf. United States v. Young*, 634 F.2d 1136, 1139 (8th Cir.1980) (prosecutor's reference during summation to items not in evidence held not prejudicial to defendant).

### III. *Conclusion.*

In summary, we reverse the conviction of Quintero under the Travel Act (Count V of the indictment). We remand the convictions on the other counts against Perez and Quintero to the district court for specific findings whether the seizure of evidence in question by police under the warrant was tainted by the prior illegal entry into the Perez home. We direct that the district court expeditiously resolve this issue and promptly certify its findings and any opinion thereon to this court. We retain jurisdiction of this appeal pending further proceedings in the district court.[9]

We also hold that the district court did not err in its instruction to the jury regarding cocaine or in permitting the expert testimony regarding cocaine. Finally, we hold that the district court properly denied Quintero's and Perez' motions for mistrial based upon comments by the prosecutor in closing argument.

---

**8.** The Government made the following argument:

> Finally, we get to part of Mr. McAvoy's mention of the things he said had to do also with the entire Government's case. First he talks about the police report and the affidavit, talking about whether Tom was mentioned. Well, certain things are consistent throughout the case. Jainchill said whoever was coming into the house that night was there to buy ten ounces. There's no dispute about that. Jainchill said that Perez didn't want him to see him. Even Perez admits that. Jainchill says that he was ushered out of the house so as not to see anybody. There is no dispute about that so they want to make a major case out of the fact that the name Tom isn't in the police report or affidavit and I'll tell you what. There is a twenty-five page police report. According to Detective Hegger's testimony it's a three page affi-

davit and you know what? The defense read about two lines to you out of the both of them. There's a whole lot in there that I would love for you to have been able to read—

> Mr. Martin: I'll object to that, Your Honor.
> The Court: Objection sustained as to certain sections concerning the law and do not concern the factual interpretation.
> Mr. Crowe: The defendant doesn't offer them in any event. As to the final count now—
> Mr. McAvoy: Your Honor, I'll object to that.
> Mr. Martin: I'll ask leave to—I ask leave to make a record.
> The Court: I sustain the objection.

**9.** The district court may proceed on the record as already made, or, at its discretion, permit further testimony relating to the motion by defendants to suppress the seized evidence.