UNITED STATES of America, Plaintiff,

v.

Amparo PULIESE, Oscar Alberto Caycedo–Ortiz, and Luis Barreto, Defendants.

No. 87–327–CR.

United States District Court, S.D. Florida.

Oct. 21, 1987.

Jonathan Goodman, Asst. U.S. Atty., S.D. Fla., Miami, Fla., for the U.S.

Samuel J. Rabin, Jr., Miami, Fla., for defendant Oscar Alberto Caycedo–Ortiz.

## ORDER

MARCUS, District Judge.

THIS CAUSE came before the Court upon the Motion of Defendant Oscar Alberto Caycedo–Ortiz to suppress all physical evidence seized on May 9, 1987, from a residence at 13430 S.W. 98th Place in Dade County, Florida. Among the items seized from the house and the attached garage were: some four kilograms of cocaine wrapped in various packages; several cases of acetone and other chemicals, including hexane, ammonium hydroxide and hydrochloric acid, used in the manufacture of cocaine; a ten ton hydraulic press; more than $13,000 in cash and two handguns. The Defendant Caycedo–Ortiz has contended that these items were seized pursuant to an invalid search warrant, which was based upon an initial warrantless entry, in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Co–Defendant Amparo Puliese also moved to suppress as evidence against her all items seized at the same address. We set this matter down for a full evidentiary hearing on September 17, 1987, at which time the Defendant Amparo Puliese, then released on bond, failed to appear. This Court issued a warrant for her arrest, declared her to be a fugitive and severed her from the other two Defendants in the case—Oscar Alberto Caycedo–Ortiz and Luis Barreto.[1]

A full evidentiary hearing was held in order to resolve the issues raised in Caycedo–Ortiz' Motion to Suppress. The government has taken the position that Caycedo–

---

1. We offer no opinion as to the standing of Amparo Puliese to challenge the search of the home at 98th Place.

Ortiz lacks the requisite standing to challenge the search of the home and the seizure of the cocaine, cocaine processing chemicals, weapons and other physical evidence. The government has not, however, contested the merits of the search and seizure, conceding that if Defendant Caycedo–Ortiz has the necessary standing to challenge the validity of the search, it would not attempt to justify the search and seizure.

The central issue for resolution is whether the Defendant Caycedo–Ortiz, who asserts no proprietary or possessory interest in the premises searched or in the items seized, nevertheless had a legitimate expectation of privacy in the invaded place as an overnight guest at the residence.

## I.

At the suppression hearing, three witnesses were called to testify: Defendant Caycedo–Ortiz, Metro–Dade Police Department Detective Pete Hames, and DEA Special Agent Adolphus Wright. Additionally, we received in evidence some 14 photographs of the home searched and the items seized by law enforcement agents on May 9, 1987. For the reasons described at some length below, we have denied the Motion to Suppress and we make the following Findings of Fact and Conclusions of Law.

First, the Defendant Caycedo–Ortiz testified for the defense in order to establish standing to contest the search. We have found much of this testimony to be ambiguous and evasive as to material matters, and some of it to be false. The Defendant testified that sometime late in April or early May 1987, he drove his own car, a 1980 white station wagon from his home in the Bronx, New York, to Miami, Florida. He stated that he had taken with him two suitcases filled with his clothing and stored them in the back of his car; and that he came to Miami because he found the climate pleasing and also because he was seeking employment opportunities and pursuing unstated "proposals." Although he was questioned at considerable length as to what job opportunities he sought, and which jobs he may have left behind in New York City, the Defendant was notably vague. He did testify, however, that he had lived in New York City since 1985, when he immigrated from Colombia, that he had lived in South Florida sometime between 1985 and 1987, and that much of his family remained in New York City.

The Defendant Caycedo–Ortiz further testified that he visited a friend, Luis Rios, sometime shortly after arriving in Miami late in April or early May 1987. He claimed that he slept at the home of Mr. Rios "perhaps one night," and that on May 8, 1987, Rios asked the Defendant to join Rios in visiting Rios' mother, Amparo Puliese. The Defendant's recollection was quite vivid as to the events occurring between mid-day Friday, May 8, 1987, and mid-day Saturday, May 9, 1987, but he could not recall with any clarity what he had done or where he resided just before, opining simply that he was "very disorganized with respect to dates." Caycedo–Ortiz stated alternatively that he had slept in his car, that he stayed a few nights in an unspecified motel or hotel, and that he slept at the Rios' home. He could not recall exactly where he stayed or for how long.

The Defendant testified that on May 8, 1987, at the invitation of Mr. Rios, he went with Rios to visit Amparo Puliese. The Defendant specifically recalled that Rios asked him to join Rios so that they could play billiard pool or swim together. It was not the Defendant's intention to remain overnight at the mother's house, but that possibility arose when the Defendant went to Amparo's house at 13430 S.W. 98th Place. The Defendant testified that he drove to the home, which is located in a residential section of South Dade County, in his own car, and that he parked his car in an attached garage. The Defendant left two packed suitcases in his parked car in the garage, but took into the house a small hand-carried bag which contained some toilet articles, including talcum powder, a shaver and cologne, some socks, underwear, a sweatshirt and bathing trunks. He also carried into the home a leather jacket which contained his passport. He hung the

leather jacked in a bedroom closet, which was filled with other clothing, and placed the hand-carried bag on the floor of the bedroom. The Defendant indicated that he had visited this home before, but that he did not remember exactly when. He also said that he had slept there sometime before the events which unfolded on May 8 or 9, 1987, but again he could not remember any of the details.

The Defendant indicated that on May 8, he changed into swim trunks and went swimming in a swimming pool in the backyard of the home. While it had not been his intention to sleep at the home, after Rios asked him to stay, apparently with the mother's approval, he decided to sleep over. There was no discussion as to how long he could stay. He indicated that he only planned to stay a few nights, perhaps through the weekend, and drive back to New York City at the start of the following week. Caycedo–Ortiz said that he had spent some time looking for a job during the preceding period in Miami, perhaps a week or so, but that he could not remember anything about the steps he took to secure employment. As the defendant himself put it: he was "just passing through."

At no point in his testimony did the Defendant indicate who owned the home in question, nor what interest, if any, Luis Rios or his mother, Amparo Puliese, had in the house on 98th Place. The Defendant did recall sleeping in one of the bedrooms in the home—where he had hung his jacket in an otherwise full closet. He also recalled seeing a ten ton hydraulic press in that bedroom closet. He said that he swam at the home, played billiards, ate dinner which was prepared by Amparo Puliese Friday night in the dining room, and that he took a bath in one of the bathrooms. He left his toilet articles and his personal belongings, however, in the bedroom. The Defendant claimed that Rios' mother, Amparo Puliese, slept in another bedroom, and that there were four bedrooms in all in the home. No one else apparently slept in the other two bedrooms.

The Defendant indicated that he was not given permission to use any of the bedrooms other than the one he occupied one night, but that no one had told him explicitly to stay out of any other bedroom. The following morning the Defendant drove his car to a nearby shopping mall and placed a telephone call to an unidentified "girlfriend" who lived in Miami. He could not recall the woman's name, describing the matter as "a weekend adventure." He testified that he left the house, without a key, having been given none by Amparo Puliese, and that when he departed from the home, he purposely left the garage door open and the door connecting the garage to the home likewise open, so that he could return to the house. No one gave him a portable garage door opener to enable him to re-enter. He further said that he left his jacket and passport in the bedroom of the house when he left. As the Defendant put it, he "had nothing to hide" in the bedroom; moreover, he indicated that he left the door to the bedroom which he had occupied unlocked. He returned to the home soon thereafter and did not leave again. Later that morning, he had brunch, and, apparently still later, his friend Rios returned. The Defendant did not suggest that he had the authority or power to exclude anyone from the house.

The Defendant further related that he was swimming in the pool in the patio area when Amparo Puliese asked him to go to the front door. At the front door, he claimed to have seen a police officer with a drawn weapon, who asked the Defendant if he knew who owned the house, who else was present and who lived there. Soon thereafter the police entered the house in order to conduct a "protective sweep."

The government called Metro–Dade Police Detective Pete Hames to testify. Hames stated that he was assigned to a Metro–Dade crime suppression team on the 9th of May and that when he arrived at the house in question, after observing a number of unusual events—not relevant to the issues raised by this motion—he observed the front door open. He testified specifically that the Defendant Caycedo–Ortiz walked from the pool/patio area to the front door, clad in swimming trunks. Hames asked the Defendant if the Defend-

ant owned the home, and the Defendant said no. The Defendant was also asked if he lived at the home, and, again, notably the Defendant said no. Finally, Hames asked the Defendant if there was anyone else in there and, most significantly, the Defendant stated that he did not know if there was anyone in the home. Hames also testified—in direct conflict with the Defendant's account—that his weapon was not drawn. We specifically credit Hames testimony and do not believe the testimony of the Defendant to the extent that it conflicts—as it does—with Hames' account. The Defendant was not telling the truth when he claimed that he did not know if there was anyone in the home, at the time when a number of others including Amparo Puliese were present.

Agent Hames further testified that upon entry into the home, he and other officers discovered the following pieces of evidence throughout the house:

1. In what has been called the middle or second bedroom (the bedroom in which the Defendant claimed to have slept Friday night), the agents found a ten-ton hydraulic press in the closet on the floor. The closet door was open, and the Defendant's leather jacket, along with other clothing not belonging to the Defendant, was found hanging in the closet. The press and various other items including a variety of chemicals found throughout the home indicated to Detective Hames that a cocaine laboratory or manufacturing facility had operated at the home. In this bedroom, the agents also found the Defendant's hand-carried bag on the bedroom floor. None of the Defendant's clothing, other than the leather jacket, was unpacked. Government Exhibit 17—a photo of this bedroom—reveals many articles of clothing hanging in the closet and also many pairs of shoes and sneakers stacked within the closet.

2. In the front bedroom, on top of a nightstand, right next to the bed, was found three packages of cocaine, wrapped in tape, and brick-shaped. *See* Government Exhibit 15. There is no indication that the Defendant ever stayed in, or in any way used this bedroom.

3. Inside of an empty kitchen cabinet, the agents discovered an additional quantity of cocaine. *See* Government Exhibits 18 and 19. The cabinet also contained only a few glasses and a package of tea.

4. Additionally, the agents discovered some $13,000 in cash and two weapons in what was believed to be the master bedroom.

5. In the attached garage, the agents discovered a variety of chemicals, including a five gallon can of hexane, numerous gallon cans of acetone, drying lamps, dehumidifiers, and gloves—tools of the trade in the manufacture of cocaine. These items were found throughout the attached garage, stacked in cans, open boxes and containers. Also found within the garage was Defendant's parked white station wagon car. *See* Government Exhibits 22a–h; 26a–(i).

6. Finally, in one of the bathrooms in the house, the agents found still more chemicals, i.e., hydrochloric acid stored in two stacked styrofoam crates; additionally, there was an open box of chemicals stacked on top of the styrofoam crates. These styrofoam crates were labeled hydrochloric acid, and there was an additional label on the side of the crate warning that it was "corrosive." These boxes were stacked up four feet high and in plain view in the bathroom.

The government also presented the testimony of DEA Special Agent Adolphus Wright, who is assigned to a Drug Enforcement Administration "clandestine laboratory group." Wright testified that on May 9, 1987 he responded to a Metro–Dade Police Department call that there was a suspected clandestine cocaine laboratory at the home in question. Wright made a number of efforts to ascertain the ownership of the home at 13430 S.W. 98th Place. A property check initially revealed that it had been owned by Luis and Lydia Caldera, who, in turn, sold the property, according to the seller's lawyer, to Olga Cordoba. Attorney George Machin told Agent Wright that the property was sold on December 31, 1986. Wright inquired further of the surrounding neighbors, none of

whom had ever seen or knew Olga Cordoba. Wright further stated that he attempted unsuccessfully to speak with the owner, Olga Cordoba. Cordoba's telephone number turned out to be disconnected. Further investigation revealed that the Florida Power and Light utility bill was charged to a Guillermo Cordoba.

During the search of the home in question, Wright found a number of documents which he seized. Included among them were the following:

1. An electric bill in the name of Rudolfo Leonardo for March and April 1987, for the home in question;

2. A cellular telephone bill in the name of still another individual, but notably not Amparo Puliese, Luis Rios, or Olga Cordoba.

3. An unopened Saks 5th Avenue bill in the name of one R. Piño; and

4. A bill addressed to Phillipe Rincon Assoc. Insurance Broker—at the 98th Place address.

No real estate records were discovered revealing any proprietary or possessory interest of Amparo Puliese or Luis Rios in the home. Other documents discovered in the home included a prescription in the name of Amparo Rios, a letter addressed to Amparo Puliese at another location, and a second letter also addressed to Amparo Puliese at still another address. Finally the agent indicated that women's clothing was found in a closet at the home.

The Defendant presented no other evidence to establish the ownership of the home, or what interest Puliese or Rios may have had. He argued simply that as an invited guest who slept in the home for one night, and who ate in the home and brought a small amount of clothing and toilet articles into the bedroom, he had a legitimate expectation of privacy deserving of the protection of the Fourth Amendment. The government has argued that on this record Defendant has not met his burden of proof as to standing; that his testimony is not worthy of belief; that even if

Defendant's testimony is credible, he has not established any reasonable expectation of privacy throughout the home; and, that at most, Defendant would be entitled only to a legitimate expectation of privacy in the bedroom which he occupied one night.

## II.

It is by now clear that a person who challenges the constitutionality of a search must demonstrate that he possesses a legitimate expectation of privacy in the premises searched or the items seized. See *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Rackley*, 742 F.2d 1266 (11th Cir.1984). As the United States Court of Appeals for the Eleventh Circuit observed in *Rackley*, 742 F.2d at 1270: "A defendant's fourth amendment rights are violated only when the challenged conduct invades that party's legitimate expectation of privacy rather than the expectation of privacy of a third party." *See also United States v. Torres*, 705 F.2d 1287, 1291–92 (11th Cir.), *vacated on other grounds*, 718 F.2d 998 (11th Cir. 1983) In the seminal case of *Rakas*, the Supreme Court refocused the standing analysis. The issue of standing has been subsumed within the "substantive question of whether or not the proponent of the motion to suppress has had his *own* Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Rakas*, 439 U.S. at 133, 99 S.Ct. at 425 (emphasis added). That requires a determination whether the intrusion has in fact "infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* at 140, 99 S.Ct. at 429. Fourth Amendment rights are personal and individual; they may not be asserted vicariously or through the interests of third parties.

The ultimate question therefore is, as Justice Powell observed, concurring in *Rakas*, "whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances."

*Id.* at 152, 99 S.Ct. at 435. No single bright line test or standard is readily available. No single factor invariably will be determinative. A variety of elements must be considered including these: (1) whether the movant has asserted any interest in the premises searched or the property seized; (2) whether he was legitimately on the premises at the time of the intrusion; (3) whether he has the right or power to exclude others from the "place"; (4) whether he has evinced a subjective expectation that the premises would remain free from governmental intrusion; and (5) whether he has taken normal precautions to maintain his privacy. Where the particular interest at issue is claimed by an invited guest at a home, we think these factors should be examined:

1.  Who has invited the guest into the home;

2.  For what purpose and for how long has the movant been invited into the home;

3.  Has the owner or lessee given the guest a key or other means of entry to the home;

4.  What use has the guest made of the home and indeed what use has been made of the intruded area;

5.  Does the movant/guest have the power and authority to exclude others from the home; and,

6.  With how many other people has the use of the area been shared.

*See, e.g., United States v. Rackley, supra; United States v. Garcia,* 741 F.2d 363 (11th Cir.1984); *United States v. Torres, supra; United States v. Briones–Garza,* 680 F.2d 417 (5th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 181 (1982); *United States v. Meyer,* 656 F.2d 979 (5th Cir. Unit B 1981); *United States v. Haydel,* 649 F.2d 1152 (5th Cir. Unit A, 1981). Finally we observe that the burden of establishing standing to contest a search lies with the moving party. Put more precisely, the Defendant Caycedo–Ortiz must prove that he had a legitimate expectation of privacy in the areas searched.

On this record, we are not prepared to confer standing upon this Defendant to challenge the search conducted on May 9, 1987. Based upon the unusual facts and circumstances of this case, we find that the Defendant Caycedo–Ortiz did not have any reasonable and legitimate expectation of privacy in the bedroom or throughout the rest of the house.

First, we observe that the Defendant Caycedo–Ortiz had no possessory interest in the premises searched or the items seized.

Second, the most which can be said, if we were to credit fully the Defendant's testimony—and we do not—is that he was invited by Luis Rios to go swimming at Rios mother's house, and that once there, Rios and his mother, Amparo Puliese, invited the Defendant to stay over for an unspecified period of time. The second problem encountered is that Defendant has not proven what proprietary or possessory interest Rios or Puliese had in the home on 98th Place. While these matters should not be determined by examining arcane distinctions in the law of property, the evidence has established that title was in the name Cordoba, and we can only speculate as to how Amparo Puliese came to occupy the home, if indeed she lived at 13430 S.W. 98th Place. There is no indication on this record, for example, that Puliese or her son Rios paid the telephone or electric bills, or indeed that either of them leased the home from its lawful owner or from anyone else. At most, we can infer only that Puliese lived there for an unspecified time, and even that is arguably undercut by the Defendant's own statement to Officer Hames that he did not know who owned the house, nor who lived there or was present at the time of the intrusion. This problem is compounded, where, as here, the evidence indicates that the record owner of the home, Olga Cordoba, has disconnected the telephone and cannot be located.

Third, any legitimate expectation of privacy is further undermined in this case inasmuch as the Defendant was neither

given a key to the house, nor an electric garage-door opener to facilitate re-entry. By his own admission, the Defendant left the garage door and another door open when he left the house and drove to a nearby mall. And he did so notwithstanding the fact that (1) the garage itself was filled with a variety of unusual items including volatile chemicals, gallon cans, drying lamps and dehumidifiers; (2) Amparo Puliese remained within the house; and (3) he had left his own small handbag, jacket and passport in the home. Any reasonable expectation of privacy would be weakened further by this behavior. The Defendant did not take any of the normal precautions one might be expected to embrace in order to maintain privacy. Nor does his behavior evince even a subjective expectation that the premises would remain free from intrusion. By his own account, he had nothing to hide, the very bedroom he occupied and the closet therein was filled with the clothing and shoes of someone else, and he left not only the garage door open, but also his bedroom door and the closet door as well. Moreover, the Defendant kept the bulk of his clothing packed in two suitcases, in his car and left a small handbag on the floor of the room. Even if we were to credit fully his testimony, these facts suggest that this Defendant was a transient and casual visitor, who, by his own account, was "just passing through."

Fourth, there is no evidence to suggest that the Defendant Caycedo–Ortiz had the right or power to exclude others from the place. Again we note that he did not possess a key to the residence, and he did not have sole use or possession of the home between mid-day Friday, May 8 and the time of the police entry, mid-Saturday, May 9. Others at the house included, apparently, Ms. Puliese, Luis Rios and a number of unidentified men.

Fifth, any reasonable expectation of privacy would be further dissipated by reason of the use made of the occupied premises. The inescapable fact is that the premises at 98th Place not only served as a residence for someone, but also was used as a clandestine cocaine laboratory. That use was neither hidden nor unclear to anyone who occupied the premises. The garage, in and out of which the Defendant drove a number of times, was laden with a variety of chemicals and paraphernalia. The bedroom closet, where Defendant hung his jacket had a ten-ton press on the floor, and one of the bathrooms had styrofoam crates of hydrochloric acid stacked up on the floor. Additionally, cocaine, firearms, and large amounts of cash were found in the bedrooms and the kitchen.

Moreover, we observe in passing that even if Defendant had a legitimate expectation of privacy in the guest bedroom—a conclusion which we reject on this record— it is by no means clear that that expectation would reasonably extend to the master bedroom or another bedroom which he neither occupied, nor used; or that the Defendant might possess a reasonable expectation of privacy in a bathroom stacked with hydrochloric acid in styrofoam crates, or in a garage filled as this one was, or in an empty kitchen cabinet. *See, e.g., United States v. Rackley, supra,* (guests have no valid expectation of privacy in garage), and *United States v. Meyer, supra,* (guest has no reasonable expectation of privacy in bathroom cabinet).

The Defendant has relied principally upon *United States v. Torres, supra,* and *United States v. Perez,* 700 F.2d 1232 (8th Cir.1983) in support of his motion. The facts of this unusual case are markedly different. To begin with, in *Torres,* the movants were present in the searched home as guests of the resident. In *Torres,* it was clear that the *resident* had given the movants permission to stay in his home and to *use* all areas of the house. In the instant case, we must rely wholly upon the unsupported word of the Defendant, whom we have found to be unconvincing and untruthful in a number of material ways. Moreover, we do not have any testimony or even an affidavit from Puliese or Rios conferring any status as invited guest upon

the Defendant. Nor is it at all clear what status Puliese may have had in the home. Moreover, unlike both *Torres* and *Perez*, the record establishes that title to the property at issue is in another name and the owner is no where to be found. Finally, unlike the facts of *Torres*, the Defendant Caycedo–Ortiz was not the only occupant, and this residence bore the characteristics and trappings of a cocaine laboratory or manufacturing facility.

In sum, the Motion to Suppress must be and is hereby DENIED. On this record, the Defendant has not established any reasonable expectation of privacy, and has not met his burden of proof.