# SEGURA ET AL. *v.* UNITED STATES

No. 82–5298.   Argued November 9, 1983—Decided July 5, 1984

BURGER, C. J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III, V, and VI, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined, and an opinion with respect to Part IV, in which O'CONNOR, J., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 817.

*Peter J. Fabricant* argued the cause for petitioners. With him on the briefs was *Paul E. Warburgh, Jr.*

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the brief were *Solicitor General Lee, Assistant Attorney General Jensen*, and *Alan I. Horowitz*.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.†

We granted certiorari to decide whether, because of an earlier illegal entry, the Fourth Amendment requires suppression of evidence seized later from a private residence

---

*\*Gene Reibman* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae*.

†JUSTICE WHITE, JUSTICE POWELL, and JUSTICE REHNQUIST join all but Part IV of this opinion.

pursuant to a valid search warrant which was issued on information obtained by the police before the entry into the residence.

## I

Resolution of this issue requires us to consider two separate questions: first, whether the entry and internal securing of the premises constituted an impermissible seizure of all the contents of the apartment, seen and unseen; second, whether the evidence first discovered during the search of the apartment pursuant to a valid warrant issued the day after the entry should have been suppressed as "fruit" of the illegal entry. Our disposition of both questions is carefully limited.

The Court of Appeals affirmed the District Court's holding that there were no exigent circumstances to justify the warrantless entry into petitioners' apartment. That issue is not before us, and we have no reason to question the courts' holding that that *search* was illegal. The ensuing interference with petitioners' possessory interests in their apartment, however, is another matter. On this first question, we conclude that, assuming that there was a *seizure* of all the contents of the petitioners' apartment when agents secured the premises from within, that seizure did not violate the Fourth Amendment. Specifically, we hold that where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.[1]

---

[1] See Griswold, Criminal Procedure, 1969—Is It a Means or an End?, 29 Md. L. Rev. 307, 317 (1969); see generally 2 W. LaFave, Search and Seizure § 6.5 (1978).

The illegality of the initial entry, as we will show, has no bearing on the second question. The resolution of this second question requires that we determine whether the initial entry tainted the discovery of the evidence now challenged. On this issue, we hold that the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385 (1920).

## II

In January 1981, the New York Drug Enforcement Task Force received information indicating that petitioners Andres Segura and Luz Marina Colon probably were trafficking in cocaine from their New York apartment. Acting on this information, Task Force agents maintained continuing surveillance over petitioners until their arrest on February 12, 1981. On February 9, agents observed a meeting between Segura and Enrique Rivudalla-Vidal, during which, as it later developed, the two discussed the possible sale of cocaine by Segura to Rivudalla-Vidal. Three days later, February 12, Segura telephoned Rivudalla-Vidal and agreed to provide him with cocaine. The two agreed that the delivery would be made at 5 p. m. that day at a designated fast-food restaurant in Queens, N. Y. Rivudalla-Vidal and one Esther Parra, arrived at the restaurant at 5 p. m., as agreed. While Segura and Rivudalla-Vidal visited inside the restaurant, agents observed Colon deliver a bulky package to Parra, who had remained in Rivudalla-Vidal's car in the restaurant parking lot. A short time after the delivery of the package, Rivudalla-Vidal and Parra left the restaurant and

proceeded to their apartment. Task Force agents followed. The agents stopped the couple as they were about to enter Rivudalla-Vidal's apartment. Parra was found to possess cocaine; both Rivudalla-Vidal and Parra were immediately arrested.

After Rivudalla-Vidal and Parra were advised of their constitutional rights, Rivudalla-Vidal agreed to cooperate with the agents. He admitted that he had purchased the cocaine from Segura and he confirmed that Colon had made the delivery at the fast-food restaurant earlier that day, as the agents had observed. Rivudalla-Vidal informed the agents that Segura was to call him at approximately 10 o'clock that evening to learn if Rivudalla-Vidal had sold the cocaine, in which case Segura was to deliver additional cocaine.

Between 6:30 and 7 p. m., the same day, Task Force agents sought and received authorization from an Assistant United States Attorney to arrest Segura and Colon. The agents were advised by the Assistant United States Attorney that because of the lateness of the hour, a search warrant for petitioners' apartment probably could not be obtained until the following day, but that the agents should proceed to secure the premises to prevent the destruction of evidence.

At about 7:30 p. m., the agents arrived at petitioners' apartment and established external surveillance. At 11:15 p. m., Segura, alone, entered the lobby of the apartment building where he was immediately arrested by agents. He first claimed he did not reside in the building. The agents took him to his third floor apartment, and when they knocked on the apartment door, a woman later identified as Colon appeared; the agents then entered with Segura, without requesting or receiving permission. There were three persons in the living room of the apartment in addition to Colon. Those present were informed by the agents that Segura was under arrest and that a search warrant for the apartment was being obtained.

Following this brief exchange in the living room, the agents conducted a limited security check of the apartment to

ensure that no one else was there who might pose a threat to their safety or destroy evidence. In the process, the agents observed, in a bedroom in plain view, a triple-beam scale, jars of lactose, and numerous small cellophane bags, all accouterments of drug trafficking. None of these items was disturbed by the agents. After this limited security check, Colon was arrested. In the search incident to her arrest, agents found in her purse a loaded revolver and more than $2,000 in cash. Colon, Segura, and the other occupants of the apartment were taken to Drug Enforcement Administration headquarters.

Two Task Force agents remained in petitioners' apartment awaiting the warrant. Because of what is characterized as "administrative delay" the warrant application was not presented to the Magistrate until 5 p. m. the next day. The warrant was issued and the search was performed at approximately 6 p. m., some 19 hours after the agents' initial entry into the apartment. In the search pursuant to the warrant, agents discovered almost three pounds of cocaine, 18 rounds of .38-caliber ammunition fitting the revolver agents had found in Colon's possession at the time of her arrest, more than $50,000 cash, and records of narcotics transactions. Agents seized these items, together with those observed during the security check the previous night.

Before trial in the United States District Court in the Eastern District of New York, petitioners moved to suppress all of the evidence seized from the apartment—the items discovered in plain view during the initial security check and those not in plain view first discovered during the subsequent warrant search.[2] After a full evidentiary hearing, the

---

[2] Rivudalla-Vidal and Parra were indicted with petitioners and were charged with one count of possession with intent to distribute one-half kilogram of cocaine on one occasion and one kilogram on another occasion. Both pleaded guilty to the charges. They moved in the District Court to suppress the one-half kilogram of cocaine found on Parra's person at the time of their arrests on the ground that the Task Force agents had stopped them in violation of *Terry* v. *Ohio*, 392 U. S. 1 (1968). The court denied

District Court granted petitioners' motion. The court ruled that there were no exigent circumstances justifying the initial entry into the apartment. Accordingly, it held that the entry, the arrest of Colon and search incident to her arrest, and the effective seizure of the drug paraphernalia in plain view were illegal. The District Court ordered this evidence suppressed as "fruits" of illegal searches.

The District Court held that the warrant later issued was supported by information sufficient to establish probable cause; however, it read *United States* v. *Griffin*, 502 F. 2d 959 (CA6), cert. denied, 419 U. S. 1050 (1974), as requiring suppression of the evidence seized under the valid warrant.[3] The District Court reasoned that this evidence would not necessarily have been discovered because, absent the illegal entry and "occupation" of the apartment, Colon might have arranged to have the drugs removed or destroyed, in which event they would not have been in the apartment when the warrant search was made. Under this analysis, the District Court held that even the drugs seized under the valid warrant were "fruit of the poisonous tree."

On an appeal limited to the admissibility of the incriminating evidence, the Court of Appeals affirmed in part and reversed in part. 663 F. 2d 411 (1981). It affirmed the District Court holding that the initial warrantless entry was not justified by exigent circumstances and that the evidence discovered in plain view during the initial entry must be suppressed.[4] The Court of Appeals rejected the argument

the motion. Rivudalla-Vidal and Parra absconded prior to sentencing by the District Court.

[3] In *Griffin*, absent exigent circumstances, police officers forcibly entered an apartment and discovered in plain view narcotics and related paraphernalia. The entry took place while other officers sought a search warrant. The Court of Appeals for the Sixth Circuit affirmed the District Court's grant of the defendant's suppression motion.

[4] Both the District Court and the Court of Appeals held that the initial entry into the apartment was not justified by exigent circumstances, and thus that the items discovered in plain view during the limited security

advanced by the United States that the evidence in plain view should not be excluded because it was not actually "seized" until after the search warrant was secured.

Relying upon its holding in *United States* v. *Agapito*, 620 F. 2d 324 (CA2), cert. denied, 449 U. S. 834 (1980),[5] the Court of Appeals reversed the District Court's holding requiring suppression of the evidence seized under the valid warrant executed on the day following the initial entry. The Court of Appeals described as "prudentially unsound" the District Court's decision to suppress that evidence simply because it could have been destroyed had the agents not entered.

Petitioners were convicted of conspiring to distribute cocaine, in violation of 21 U. S. C. § 846, and of distributing and possessing with intent to distribute cocaine, in violation of 21 U. S. C. § 841(a)(1). On the subsequent review of these convictions, the Second Circuit affirmed, 697 F. 2d 300 (1982), rejecting claims by petitioners that the search warrant was procured through material misrepresentations and that the evidence at trial was insufficient as a matter of law to support

---

check had to be suppressed to effect the purposes of the Fourth Amendment. The United States, although it does not concede the correctness of this holding, does not contest it in this Court. Because the Government has decided not to press its argument that exigent circumstances existed, we need not and do not address this aspect of the Court of Appeals decision. We are concerned only with whether the Court of Appeals properly determined that the Fourth Amendment did not require suppression of the evidence seized during execution of the valid warrant.

[5] In *Agapito*, DEA agents, following a 2-day surveillance of the defendant's hotel room, arrested the suspected occupants of the room in the lobby of the hotel. After the arrests, the agents entered the hotel room and remained within, with the exception of periodic departures, for almost 24 hours until a search warrant issued. During their stay in the room, the agents seized but did not open a suitcase found in the room. In the search pursuant to the warrant, the agents found cocaine in the suitcase. Although the Second Circuit held that the initial entry was illegal, it held that the cocaine need not be suppressed because it was discovered in the search under the valid warrant.

their convictions. We granted certiorari, 459 U. S. 1200 (1983), and we affirm.

## III

At the outset, it is important to focus on the narrow and precise question now before us. As we have noted, the Court of Appeals agreed with the District Court that the initial warrantless entry and the limited security search were not justified by exigent circumstances and were therefore illegal. No review of that aspect of the case was sought by the Government and no issue concerning items observed during the initial entry is before the Court. The only issue here is whether drugs and the other items not observed during the initial entry and first discovered by the agents the day after the entry, under an admittedly valid search warrant, should have been suppressed.

The suppression or exclusionary rule is a judicially prescribed remedial measure and as "with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States* v. *Calandra,* 414 U. S. 338, 348 (1974). Under this Court's holdings, the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, *Weeks* v. *United States,* 232 U. S. 383 (1914), but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Nardone* v. *United States,* 308 U. S. 338, 341 (1939). It "extends as well to the indirect as the direct products" of unconstitutional conduct. *Wong Sun* v. *United States,* 371 U. S. 471, 484 (1963).

Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion. The question to be resolved when it is claimed that evidence subsequently obtained is "tainted" or is "fruit" of a prior illegality is whether the challenged evidence was

> "'come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged

of the primary taint.'" *Id.*, at 488 (citation omitted; emphasis added).

It has been well established for more than 60 years that evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is "so attenuated as to dissipate the taint," *Nardone* v. *United States, supra,* at 341. It is not to be excluded, for example, if police had an "independent source" for discovery of the evidence:

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. *If knowledge of them is gained from an independent source they may be proved like any others.*" *Silverthorne Lumber Co.* v. *United States,* 251 U. S., at 392 (emphasis added).

In short, it is clear from our prior holdings that "the exclusionary rule has no application [where] the Government learned of the evidence 'from an independent source.'" *Wong Sun, supra,* at 487 (quoting *Silverthorne Lumber Co., supra,* at 392); see also *United States* v. *Crews,* 445 U. S. 463 (1980); *United States* v. *Wade,* 388 U. S. 218, 242 (1967); *Costello* v. *United States,* 365 U. S. 265, 278–280 (1961).

## IV

Petitioners argue that all of the contents of the apartment, seen and not seen, including the evidence now in question, were "seized" when the agents entered and remained on the premises while the lawful occupants were away from the apartment in police custody. The essence of this argument is that because the contents were then under the control of the agents and no one would have been permitted to remove the incriminating evidence from the premises or destroy it, a

"seizure" took place. Plainly, this argument is advanced to avoid the *Silverthorne* "independent source" exception. If all the contents of the apartment were "seized" at the time of the illegal entry and securing, presumably the evidence now challenged would be suppressible as primary evidence obtained as a direct result of that entry.

We need not decide whether, when the agents entered the apartment and secured the premises, they effected a seizure of the cocaine, the cash, the ammunition, and the narcotics records within the meaning of the Fourth Amendment. By its terms, the Fourth Amendment forbids only "unreasonable" searches and seizures. Assuming, *arguendo*, that the agents seized the entire apartment and its contents, as petitioners suggest, the seizure was not unreasonable under the totality of the circumstances.

Different interests are implicated by a seizure than by a search. *United States* v. *Jacobsen*, 466 U. S. 109, 113, and n. 5, 122–126 (1984); *Texas* v. *Brown*, 460 U. S. 730 (1983); *id.*, at 747–748 (STEVENS, J., concurring in judgment); *United States* v. *Chadwick*, 433 U. S. 1, 13–14, n. 8 (1977); *Chambers* v. *Maroney*, 399 U. S. 42, 51–52 (1970). A seizure affects only the person's possessory interests; a search affects a person's privacy interests. *United States* v. *Jacobsen, supra*, at 113, and n. 5; *United States* v. *Chadwick, supra*, at 13–14, n. 8; see generally *Texas* v. *Brown, supra*, at 747–751 (STEVENS, J., concurring in judgment). Recognizing the generally less intrusive nature of a seizure, *Chadwick, supra*, at 13–14, n. 8; *Chambers* v. *Maroney, supra*, at 51, the Court has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible. *Chambers* v. *Maroney, supra; United States* v. *Chadwick, supra; Arkansas* v. *Sanders*, 442 U. S. 753 (1979).[6]

---

[6] In two instances, the Court has allowed temporary seizures and limited detentions of property based upon less than probable cause. In *United States* v. *Van Leeuwen*, 397 U. S. 249 (1970), the Court refused to

We focused on the issue notably in *Chambers*, holding that it was reasonable to seize and impound an automobile, on the basis of probable cause, for "whatever period is necessary to obtain a warrant for the search." 399 U. S., at 51 (footnote omitted). We acknowledged in *Chambers* that following the car until a warrant could be obtained was an alternative to impoundment, albeit an impractical one. But we allowed the seizure nonetheless because otherwise the occupants of the car could have removed the "instruments or fruits of crime" before the search. *Id.*, at 51, n. 9. The Court allowed the warrantless seizure to protect the evidence from destruction even though there was no immediate fear that the evidence was in the process of being destroyed or otherwise lost. The *Chambers* Court declared:

> "For constitutional purposes, we see no difference between on the one hand seizing and holding the car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. *Given probable cause to search,*

invalidate the seizure and detention—on the basis of only reasonable suspicion—of two packages delivered to a United States Post Office for mailing. One of the packages was detained on mere suspicion for only 1½ hours; by the end of that period enough information had been obtained to establish probable cause that the packages contained stolen coins. But the other package was detained for 29 hours before a search warrant was finally served. Both seizures were held reasonable. In fact, the Court suggested that both seizures and detentions for these "limited times" were "prudent" under the circumstances.

Only last Term, in *United States* v. *Place*, 462 U. S. 696 (1983), we considered the validity of a brief seizure and detention of a traveler's luggage, on the basis of a reasonable suspicion that the luggage contained contraband; the purpose of the seizure and brief detention was to investigate further the causes for the suspicion. Although we held that the 90-minute detention of the luggage in the airport was, under the circumstances, unreasonable, we held that the rationale of *Terry* v. *Ohio*, 392 U. S. 1 (1968), applies to permit an officer, on the basis of reasonable suspicion that a traveler is carrying luggage containing contraband, to seize and detain the luggage briefly to "investigate the circumstances that aroused his suspicion." 462 U. S., at 706.

*either course is reasonable under the Fourth Amendment." Id.,* at 52 (emphasis added)

In *Chadwick,* we held that the warrantless *search* of the footlocker after it had been seized and was in a secure area of the Federal Building violated the Fourth Amendment's proscription against unreasonable searches, but neither the respondents nor the Court questioned the validity of the initial warrantless *seizure* of the footlocker on the basis of probable cause. The seizure of Chadwick's footlocker clearly interfered with his use and possession of the footlocker—his possessory interest—but we held that this did not "diminish [his] legitimate expectation that the footlocker's *contents* would remain private." 433 U. S., at 13–14, n. 8 (emphasis added). And again, in *Arkansas* v. *Sanders, supra,* we held that absent exigent circumstances a warrant was required to search luggage seized from an automobile which was already in the possession and control of police at the time of the search. However, we expressly noted that the police acted not only "properly," but "commendably" in seizing the suitcase without a warrant on the basis of probable cause to believe that it contained drugs. 442 U. S., at 761. The taxi into which the suitcase had been placed was about to drive away. However, just as there was no immediate threat of loss or destruction of evidence in *Chambers*—since officers could have followed the car until a warrant issued—so too in *Sanders* officers could have followed the taxicab. Indeed, there arguably was even less fear of immediate loss of the evidence in *Sanders* because the suitcase at issue had been placed in the vehicle's trunk, thus rendering immediate access unlikely before police could act.

Underlying these decisions is a belief that society's interest in the discovery and protection of incriminating evidence from removal or destruction can supersede, at least for a limited period, a person's possessory interest in property, provided that there is probable cause to believe that that property is associated with criminal activity. See *United States* v. *Place,* 462 U. S. 696 (1983).

The Court has not had occasion to consider whether, when officers have probable cause to believe that evidence of criminal activity is on the premises, the temporary securing of a dwelling to prevent the removal or destruction of evidence violates the Fourth Amendment. However, in two cases we have suggested that securing of premises under these circumstances does not violate the Fourth Amendment, at least when undertaken to preserve the status quo while a search warrant is being sought. In *Mincey* v. *Arizona*, 437 U. S. 385 (1978), we noted with approval that, to preserve evidence, a police guard had been stationed at the entrance to an apartment in which a homicide had been committed, even though "[t]here was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant." *Id.*, at 394. Similarly, in *Rawlings* v. *Kentucky*, 448 U. S. 98 (1980), although officers secured, from within, the home of a person for whom they had an arrest warrant, and detained all occupants while other officers were obtaining a search warrant, the Court did not question the admissibility of evidence discovered pursuant to the warrant later issued.[7]

---

[7] A distinguished constitutional scholar raised the question whether a seizure of premises might not be appropriate to preserve the status quo and protect valuable evidence while police officers in good faith seek a warrant.

"Here there is a very real practical problem. Does the police officer have any power to maintain the status quo while he, or a colleague of his, is taking the time necessary to draw up a sufficient affidavit to support an application for a search warrant, and then finding a magistrate, submitting the application to him, obtaining the search warrant if it is issued, and then bringing it to the place where the arrest was made. It seems inevitable that a minimum of several hours will be required for this process, at the very best. *Unless there is some kind of a power to prevent removal of material from the premises, or destruction of material during this time, the search warrant will almost inevitably be fruitless.*" Griswold, 29 Md. L. Rev., at 317 (emphasis added).

Justice Black posed essentially the same question in his dissent in *Vale* v. *Louisiana*, 399 U. S. 30, 36 (1970). After pointing out that Vale's arrest just outside his residence was "plainly visible to anyone within the house,

We see no reason, as *Mincey* and *Rawlings* would suggest, why the same principle applied in *Chambers*, *Chadwick*, and *Sanders*, should not apply where a dwelling is involved. The sanctity of the home is not to be disputed. But the home is sacred in Fourth Amendment terms not primarily because of the occupants' *possessory* interests in the premises, but because of their *privacy* interests in the activities that take place within. "[T]he Fourth Amendment protects people, not places." *Katz* v. *United States*, 389 U. S. 347, 351 (1967); see also *Payton* v. *New York*, 445 U. S. 573, 615 (1980) (WHITE, J., dissenting).

As we have noted, however, a seizure affects only possessory interests, not privacy interests. Therefore, the heightened protection we accord privacy interests is simply not implicated where a *seizure* of premises, not a search, is at issue. We hold, therefore, that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents. We reaffirm at the same time, however, that, absent exigent circumstances, a warrantless search—such as that invalidated in *Vale* v. *Louisiana*, 399 U. S. 30, 33–34 (1970)—is illegal.

Here, the agents had abundant probable cause in advance of their entry to believe that there was a criminal drug operation being carried on in petitioners' apartment; indeed petitioners do not dispute the probable-cause determination. The agents had maintained surveillance over petitioners for weeks, and had observed petitioners leave the apartment to

and the police had every reason to believe that someone in the house was likely to destroy the contraband if the search were postponed," he noted:

"This case raises most graphically the question how does a policeman protect evidence necessary to the State if he must leave the premises to get a warrant, allowing the evidence he seeks to be destroyed. The Court's answer to that question makes unnecessarily difficult the conviction of those who prey upon society." *Id.*, at 41.

make sales of cocaine. Wholly apart from observations made during that extended surveillance, Rivudalla-Vidal had told agents after his arrest on February 13, that petitioners had supplied him with cocaine earlier that day, that he had not purchased all of the cocaine offered by Segura, and that Segura probably had more cocaine in the apartment. On the basis of this information, a Magistrate duly issued a search warrant, the validity of which was upheld by both the District Court and the Court of Appeals, and which is not before us now.

In this case, the agents entered and secured the apartment from within. Arguably, the wiser course would have been to depart immediately and secure the premises from the outside by a "stakeout" once the security check revealed that no one other than those taken into custody were in the apartment. But the method actually employed does not require a different result under the Fourth Amendment, insofar as the *seizure* is concerned. As the Court of Appeals held, absent exigent circumstances, the entry may have constituted an illegal *search*, or interference with petitioners' privacy interests, requiring suppression of all evidence observed during the entry. Securing of the premises from within, however, was no more an interference with the petitioners' possessory interests in the contents of the apartment than a perimeter "stakeout." In other words, the initial entry—legal or not—does not affect the reasonableness of the seizure. Under either method—entry and securing from within or a perimeter stakeout—agents control the apartment pending arrival of the warrant; both an internal securing and a perimeter stakeout interfere to the same extent with the possessory interests of the owners.

Petitioners argue that we heighten the possibility of illegal entries by a holding that the illegal entry and securing of the premises from the inside do not themselves render the *seizure* any more unreasonable than had the agents staked out the apartment from the outside. We disagree. In the

first place, an entry in the absence of exigent circumstances is illegal. We are unwilling to believe that officers will routinely and purposely violate the law as a matter of course. Second, as a practical matter, officers who have probable cause and who are in the process of obtaining a warrant have no reason to enter the premises before the warrant issues, absent exigent circumstances which, of course, would justify the entry. *United States* v. *Santana*, 427 U. S. 38 (1976); *Johnson* v. *United States*, 333 U. S. 10 (1948). Third, officers who enter illegally will recognize that whatever evidence they discover as a direct result of the entry may be suppressed, as it was by the Court of Appeals in this case. Finally, if officers enter without exigent circumstances to justify the entry, they expose themselves to potential civil liability under 42 U. S. C. § 1983. *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388 (1971).

Of course, a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons. Cf. *United States* v. *Place*, 462 U. S. 696 (1983). Here, because of the delay in securing the warrant, the occupation of the apartment continued throughout the night and into the next day. Such delay in securing a warrant in a large metropolitan center unfortunately is not uncommon; this is not, in itself, evidence of bad faith. And there is no suggestion that the officers, in bad faith, purposely delayed obtaining the warrant. The asserted explanation is that the officers focused first on the task of processing those whom they had arrested before turning to the task of securing the warrant. It is not unreasonable for officers to believe that the former should take priority, given, as was the case here, that the proprietors of the apartment were in the custody of the officers throughout the period in question.

There is no evidence that the agents in any way exploited their presence in the apartment; they simply awaited issuance of the warrant. Moreover, more than half of the 19-

hour delay was between 10 p. m. and 10 a. m. the following day, when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests. Finally, and most important, we observed in *United States* v. *Place, supra,* at 705, that

> "[t]he intrusion on possessory interests occasioned by a seizure . . . can vary both in its nature and extent. The seizure may be made after the owner has relinquished control of the property to a third party or . . . from the immediate custody and control of the owner."

Here, of course, Segura and Colon, whose possessory interests were interfered with by the occupation, were under arrest and in the custody of the police throughout the entire period the agents occupied the apartment. The actual interference with their possessory interests in the apartment and its contents was, thus, virtually nonexistent. Cf. *United States* v. *Van Leeuwen,* 397 U. S. 249 (1970). We are not prepared to say under these limited circumstances that the seizure was unreasonable under the Fourth Amendment.[8]

## V

Petitioners also argue that even if the evidence was not subject to suppression as primary evidence "seized" by virtue of the initial illegal entry and occupation of the premises, it should have been excluded as "fruit" derived from that illegal entry. Whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because

---

[8] Our decision in *United States* v. *Place,* 462 U. S. 696 (1983), is not inconsistent with this conclusion. There, we found unreasonable a 90-minute detention of a traveler's luggage. But the detention was based only on a suspicion that the luggage contained contraband, not on probable cause. After probable cause was established, authorities held the unopened luggage for almost three days before a warrant was obtained. It was not suggested that this delay presented an independent basis for suppression of the evidence eventually discovered.

there was an independent source for the warrant under which that evidence was seized. Exclusion of evidence as derivative or "fruit of the poisonous tree" is not warranted here because of that independent source.

None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry. No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant. It is therefore beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged. This evidence was discovered the day following the entry, during the search conducted under a valid warrant; it was the product of that search, wholly unrelated to the prior entry. The valid warrant search was a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the entry. *Wong Sun*, 371 U. S., at 488.[9] Had police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here. The legality of the initial entry is, thus, wholly irrelevant under *Wong Sun, supra,* and

---

[9] Our holding in this respect is consistent with the vast majority of Federal Courts of Appeals which have held that evidence obtained pursuant to a valid warrant search need not be excluded because of a prior illegal entry. See, *e. g., United States* v. *Perez,* 700 F. 2d 1232 (CA8 1983); *United States* v. *Kinney,* 638 F. 2d 941 (CA6), cert. denied, 452 U. S. 918 (1981); *United States* v. *Fitzharris,* 633 F. 2d 416 (CA5 1980), cert. denied, 451 U. S. 988 (1981); *United States* v. *Agapito,* 620 F. 2d 324 (CA2 1980); *United States* v. *Bosby,* 675 F. 2d 1174 (CA11 1982) (dictum). The only Federal Court of Appeals to hold otherwise is the Ninth Circuit. See *United States* v. *Lomas,* 706 F. 2d 886 (1983); *United States* v. *Allard,* 634 F. 2d 1182 (1980).

*Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920).[10]

Our conclusion that the challenged evidence was admissible is fully supported by our prior cases going back more than a half century. The Court has never held that evidence is "fruit of the poisonous tree" simply because "it would not have come to light but for the illegal actions of the police." See *Wong Sun, supra,* at 487–488; *Rawlings* v. *Kentucky,* 448 U. S. 98 (1980); *Brown* v. *Illinois,* 422 U. S. 590, 599 (1975). That would squarely conflict with *Silverthorne* and our other cases allowing admission of evidence, notwithstanding a prior illegality, when the link between the illegality and that evidence was sufficiently attenuated to dissipate the taint. By the same token, our cases make clear that evidence will not be excluded as "fruit" unless the illegality is at least the "but for" cause of the discovery of the evidence. Suppression is not justified unless "the challenged evidence is in some sense the product of illegal governmental activity." *United States* v. *Crews,* 445 U. S., at 471. The illegal entry into petitioners' apartment did not contribute in any way to discovery of the evidence seized under the warrant; it is clear, therefore, that not even the threshold "but for" requirement was met in this case.

The dissent contends that the initial entry and securing of the premises are the "but for" causes of the discovery of the evidence in that, had the agents not entered the apartment, but instead secured the premises from the outside, Colon or her friends if alerted, could have removed or destroyed the evidence before the warrant issued. While the dissent embraces this "reasoning," petitioners do not press this ar-

---

[10] It is important to note that the dissent stresses the legal status of the agents' initial entry and occupation of the apartment; however, this case involves only evidence seized in the search made subsequently under a valid warrant. Implicit in the dissent is that the agents' presence in the apartment denied petitioners some legal "right" to arrange to have the incriminating evidence concealed or destroyed.

gument. The Court of Appeals rejected this argument as "prudentially unsound" and because it rested on "wholly speculative assumptions." Among other things, the Court of Appeals suggested that, had the agents waited to enter the apartment until the warrant issued, they might not have decided to take Segura to the apartment and thereby alert Colon. Or, once alerted by Segura's failure to appear, Colon might have attempted to remove the evidence, rather than destroy it, in which event the agents could have intercepted her and the evidence.

We agree fully with the Court of Appeals that the District Court's suggestion that Colon and her cohorts would have removed or destroyed the evidence was pure speculation. Even more important, however, we decline to extend the exclusionary rule, which already exacts an enormous price from society and our system of justice, to further "protect" criminal activity, as the dissent would have us do.

It may be that, if the agents had not entered the apartment, petitioners might have arranged for the removal or destruction of the evidence, and that in this sense the agents' actions could be considered the "but for" cause for discovery of the evidence. But at this juncture, we are reminded of Justice Frankfurter's warning that "[s]ophisticated argument may prove a causal connection between information obtained through [illegal conduct] and the Government's proof," and his admonition that the courts should consider whether "[a]s a matter of good sense . . . such connection may have become so attenuated. as to dissipate the taint." *Nardone*, 308 U. S., at 341. The essence of the dissent is that there is some "constitutional right" to destroy evidence. This concept defies both logic and common sense.

## VI

We agree with the Court of Appeals that the cocaine, cash records, and ammunition were properly admitted into evidence. Accordingly, the judgment is affirmed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

Correct analysis of the Fourth Amendment issues raised by this case requires, first, a precise identification of the two constitutional violations that occurred, and, second, an explanation of why a remedy for both is appropriate. While I do not believe that the current record justifies suppression of the challenged evidence, neither does it justify affirmance of petitioners' convictions. We must consider the substantial contention, supported by the findings of the District Court and left unaddressed by the opinion of this Court, that the authorities' access to the evidence introduced against petitioners at trial was made possible only through exploitation of both constitutional violations. Because I believe that contention must be addressed before petitioners' convictions are finally affirmed, I would remand for further proceedings. The Court's disposition, I fear, will provide government agents with an affirmative incentive to engage in unconstitutional violations of the privacy of the home. The Court's disposition is, therefore, inconsistent with a primary purpose of the Fourth Amendment's exclusionary rule—to ensure that all private citizens—not just these petitioners—have some meaningful protection against future violations of their rights.

I

The events that occurred on February 12 and 13, 1981, were the culmination of an investigation of petitioners that had been under way for over two weeks. On the evening of February 12, agents of the New York Drug Enforcement Task Force arrested Rivudalla-Vidal and Parra, who told them that Segura probably had cocaine in his apartment. At that point, the agents concluded that they had probable cause to search petitioners' apartment, and contacted the United States Attorney's office. An Assistant United States Attorney informed the agents that at that hour, 6:30 p. m., it was too late to obtain a search warrant, and advised them instead to go to the apartment, arrest Segura, and "secure the

premises" pending the issuance of a warrant.[1] The agents
arrived at the apartment about an hour later and positioned
themselves on a fire escape, where they could observe any-
one entering or leaving the apartment. They also put their
ears to the door, but heard nothing.[2] After three hours of
waiting, the agents left their perch and went outside the
building, where they continued waiting for Segura to show
up. The District Court described what followed:

> "Around 11:15 p. m. Segura appeared, and as he
> began to enter the locked door at the lobby, he was ap-
> prehended, and placed in handcuffs under arrest. The
> agents, led by Shea, informed him that they wanted to
> go upstairs to 3D, to which Segura replied that he did
> not live in the building or in that apartment. Forcibly
> bringing him to the third floor, the agents began down
> the hallway, at which point Segura again resisted. Shea
> again forced him down the hallway to the door of 3D, an

---

[1] THE CHIEF JUSTICE seems to think that this problem was caused by
the unavailability of a magistrate to issue a warrant at this hour, *ante*, at
812–813. However, as the Government candidly admits, the fault here
lies not with the judiciary, but with the United States Attorney's office
for failing to exercise due diligence in attempting to procure a warrant.
One of the agents testified that the Assistant United States Attorney told
him only that *"perhaps* a Magistrate could not be found at that particular
time in the evening." Tr. 154 (emphasis supplied). The Assistant United
States Attorney testified that he did not even attempt to locate a magis-
trate or obtain a search warrant. *Id.*, at 441–442. As the Government
concedes in its brief:

"It is not clear why a greater effort was not made to obtain a search war-
rant when the officers first sought one, and we do not condone the failure
to do so . . . . We note that, subsequent to the events in this case, the
United States Attorney circulated an internal memorandum reemphasizing
that search warrants should be sought when at all possible, regardless of
the hour, in order to avoid the need for warrantless entries to secure
premises." Brief for United States 40, n. 23.

[2] Based on the information they had been given prior to their arrival at
the apartment, the agents believed, correctly as it turned out, that Segura
was not in the apartment. Tr. 394.

apartment which is located in the rear of the building, with no view of the front of the building where the arrest took place. Shea knocked on the door of 3D, with Segura standing, handcuffed, in front of him. Luz Colon, unknown to Shea at the time as such, opened the door. Detective Shea, without more, walked into the apartment with Segura in custody. He was then followed by two other agents, and five minutes later, by Palumbo. Neither Shea nor any other agent had an arrest warrant, or a search warrant. Nor did any of the officers ask for or receive consent to enter apartment 3D." App. 10–11.

The agents arrested Colon and three other persons found in the apartment. Colon was unknown to the agents at the time.[3] The agents made a cursory search of the apartment and saw various items of narcotics paraphernalia in plain view.[4] The agents left that evidence—the "prewarrant evidence"—in the apartment, but they took the arrestees to headquarters.

At least two of the agents spent the night in the apartment and remained in it thoughout the following day while their colleagues booked the arrestees and presumably persevered in their efforts to obtain a warrant to search the apartment. Finally, at 6 p. m. on February 13, the remaining agents were informed that a search warrant had just been issued, and at that point they conducted a thorough search. The District Court concluded: "There was thus a lapse of some 18–20 hours from the entry into the apartment to the execution of the search warrant, during which time the officers remained inside the apartment and in complete control of it." *Id.*, at 11. Upon searching the apartment the agents found one kilo of cocaine, over $50,000, several rounds of .38-caliber ammunition, and records of narcotics transactions.

---

[3] *Id.*, at 366, 392.

[4] However, none of this evidence could be seen until after the agents had entered the apartment. *Id.*, at 405.

## II

The Court frames the appropriate inquiry in this case as whether the evidence obtained when the search warrant was executed was a "fruit" of illegal conduct. *Ante,* at 804. As a predicate to that inquiry, the illegal conduct must, of course, be identified.

The District Court found that no exigent circumstances justified the agents' initial warrantless entry into petitioners' apartment. App. 11–13. The Court of Appeals affirmed this finding, and the Government did not seek review of it by this Court. Thus, it is uncontested that the warrantless entry of petitioners' apartment was unconstitutional.[5] It is equally clear that the subsequent 18–20-hour occupation of the apartment was independently unconstitutional for two separate reasons.

First, the occupation was an unreasonable "search" within the meaning of the Fourth Amendment. A "search" for purposes of the Fourth Amendment occurs when a reasonable expectation of privacy is infringed.[6] Nowhere are expectations of privacy greater than in the home. As the Court has repeatedly noted, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States* v. *United States District Court,* 407 U. S. 297, 313 (1972).[7] Of course, the invasion of privacy

---

[5] In *Vale* v. *Louisiana,* 399 U. S. 30 (1970), we held that absent a demonstrable threat of imminent destruction of evidence, the authorities may not enter a residence in order to preserve that evidence without a warrant. See also *United States* v. *Jeffers,* 342 U. S. 48, 51–52 (1951); *McDonald* v. *United States,* 335 U. S. 451, 454–455 (1948); *Johnson* v. *United States,* 333 U. S. 10, 13–15 (1948). The illegality is even more plain in this case because the entry was effected by force late at night.

[6] See *Oliver* v. *United States,* 466 U. S. 170, 177 (1984); *Illinois* v. *Andreas,* 463 U. S. 765, 771 (1983); *United States* v. *Knotts,* 460 U. S. 276, 280–281 (1983); *Smith* v. *Maryland,* 442 U. S. 735, 739–741 (1979); *Terry* v. *Ohio,* 392 U. S. 1, 9 (1968).

[7] See also, *e. g., Welsh* v. *Wisconsin,* 466 U. S. 740, 748 (1984); *Michigan* v. *Clifford,* 464 U. S. 287, 296–297 (1984) (plurality opinion); *Steagald*

occasioned by a physical entry does not cease after the initial entry. In *Mincey* v. *Arizona*, 437 U. S. 385 (1978), we held that although the police lawfully entered Mincey's home to arrest him, the Constitution forbade them to remain in the home and to search it. The Court reasoned that despite the lawful initial entry, Mincey retained a constitutionally protected privacy interest in his home that could not be infringed without a warrant. See *id.*, at 390–391. Similarly, in *Chimel* v. *California*, 395 U. S. 752 (1969), we could "see no reason why, simply because some interference with an individual's privacy and freedom of movement has lawfully taken place, further intrusions should automatically be allowed despite the absence of a warrant that the Fourth Amendment would otherwise require." *Id.*, at 766–767, n. 12.[8]  Here, by remaining in the home after the initial entry, the agents exacerbated the invasion of petitioners' protected privacy interests. Even assuming the most innocent of motives, the agents' occupation of petitioners' living quarters inevitably involved scrutiny of a variety of personal effects throughout the apartment.[9]  Petitioners' privacy interests were unreasonably infringed by the agents' prolonged

v. *United States*, 451 U. S. 204, 212 (1981); *Payton* v. *New York*, 445 U. S. 573, 583–590 (1980); *Coolidge* v. *New Hampshire*, 403 U. S. 443, 481 (1971); *McDonald* v. *United States*, 335 U. S., at 455–456; *Johnson* v. *United States*, 333 U. S., at 13–14.

[8] See also 395 U. S., at 764–765:

"It is argued in the present case that it is 'reasonable' to search a man's house when he is arrested in it. But that argument is founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point. It is not easy to explain why, for instance, it is less subjectively 'reasonable' to search a man's house when he is arrested on his front lawn—or just down the street—than it is when he happens to be in the house at the time of arrest."

[9] At oral argument, the Government conceded that the agents' occupation of the apartment constituted a "continuing search" for exactly this reason. Tr. of Oral Arg. 27, 31.

occupation of their home. THE CHIEF JUSTICE simply ignores this point, assuming that there is no constitutional distinction between surveillance of the home from the outside and physical occupation from the inside. THE CHIEF JUSTICE's assumption is, of course, untenable; there is a fundamental difference when there is a

> "breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone which finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.'" *Payton* v. *New York*, 445 U. S. 573, 589 (1980).

Second, the agents' occupation was also an unreasonable "seizure" within the meaning of the Fourth Amendment. A "seizure" occurs when there is some meaningful interference with an individual's possessory interests.[10] There can be no doubt here that petitioners' possessory interests with respect to their apartment were subject to meaningful governmental interference. The agents not only excluded petitioners from access to their own apartment, and thereby prevented them from exercising any possessory right at all to the apartment and its contents, but they also exercised complete dominion and control over the apartment and its contents.[11] Our cases virtually compel the conclusion that the contents of the apart-

---

[10] See *United States* v. *Karo, ante,* at 712–713; *United States* v. *Jacobsen,* 466 U. S. 109, 120–121, 124–125 (1984); *United States* v. *Place,* 462 U. S. 696, 707–708 (1983); *id.,* at 716 (BRENNAN, J., concurring in result); *Texas* v. *Brown,* 460 U. S. 730, 747–748 (1983) (STEVENS, J., concurring in judgment).

[11] While Segura was lawfully in custody during this period, Colon and her three companions were not. They were unknown to the agents prior to the illegal entry and, as the District Court noted, would have been able to remain in the apartment free from governmental interference had the unlawful entry not occurred.

ment were seized. We have held that when the police take custody of a person, they concomitantly acquire lawful custody of his personal effects, see *Illinois* v. *Lafayette*, 462 U. S. 640, 648 (1983); *United States* v. *Edwards*, 415 U. S. 800 (1974); *United States* v. *Robinson*, 414 U. S. 218 (1973); and when they take custody of a car, they are also in lawful custody of its contents, see *South Dakota* v. *Opperman*, 428 U. S. 364 (1976). Surely it follows that when the authorities take custody of an apartment they also take custody of its contents.[12]

This seizure was constitutionally unreasonable. Even a seizure reasonable at its inception can become unreasonable because of its duration. *United States* v. *Place*, 462 U. S. 696, 709–710 (1983). Even if exigent circumstances justified the entry into and impoundment of the premises pending a warrant—and no one even argues that such circumstances existed—the duration of the seizure would nevertheless have been unreasonable. While exigent circumstances may justify police conduct that would otherwise be unreasonable if undertaken without a warrant, such conduct must be "strictly circumscribed by the exigencies which justify its initiation," *Terry* v. *Ohio*, 392 U. S. 1, 25–26 (1968).[13] The cases THE CHIEF JUSTICE cites, *ante*, at 807–810, for the proposition that the government may impound premises for the amount of time necessary to procure a warrant thus have no application to this case whatsoever.[14] There is no conten-

---

[12] THE CHIEF JUSTICE's parsimonious approach to Fourth Amendment rights is vividly illustrated by the fact that, as though he were preparing an adversary's brief, he is unwilling even to acknowledge explicitly that the apartment and its contents were seized, but only "assum[es]" that was the case. *Ante*, at 806.

[13] See *Mincey* v. *Arizona*, 437 U. S. 385, 393 (1978); *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 358–359 (1977); *Vale* v. *Louisiana*, 399 U. S., at 34–35; *Chimel* v. *California*, 395 U. S. 752, 762–763 (1969).

[14] THE CHIEF JUSTICE's misuse of *Place, ante*, at 813, n. 8, is quite remarkable. He suggests that *Place* approved the almost 3-day detention of Place's luggage before a warrant was obtained, when in fact the Court had

tion that a period of 18–20 hours was even remotely necessary to procure a warrant.   The contrast between the 90-minute duration of the seizure of a piece of luggage held unreasonable in *Place* and the 18–20-hour duration of the seizure of the apartment and its contents in this case graphically illustrates the unreasonable character of the agents' conduct. Moreover, unlike *Place*, which involved a seizure lawful at its inception, this seizure was constitutionally unreasonable from the moment it began.   It was conducted without a warrant and in the absence of exigent circumstances.[15]   It has been clear since at least *Chimel* v. *California*, 395 U. S. 752 (1969), that the police may neither search nor seize the contents of a home without a warrant.[16]   There is simply no basis for concluding that this 18–20-hour warrantless invasion of petitioners' home complied with the Fourth Amendment. Because the agents unreasonably delayed in seeking judicial authorization for their seizure of petitioners' apartment, that seizure was unreasonable.

---

no occasion to reach that issue because it held that the initial 90-minute detention of the luggage pending a "sniff test" using a trained narcotics-detecting dog was *unreasonable*.   See 462 U. S., at 710.   Other than this reference to *Place*, THE CHIEF JUSTICE's diligent search for support for his holding has produced nothing but dissenting opinions and a law review article.   See *ante*, at 809–810, n. 7.   Dean Griswold's article, however, did not even purport to answer the question presented by this case.   See Griswold, Criminal Procedure, 1969—Is It a Means or an End?, 29 Md. L. Rev. 307, 317 (1969).

[15] Since these premises were impounded "from the inside," I assume impoundment would be permissible even absent exigent circumstances when it occurs "from the outside"—when the authorities merely seal off premises pending the issuance of a warrant but do not enter.

[16] See also *Steagald* v. *United States*, 451 U. S. 204 (1981); *Payton* v. *New York*, 445 U. S. 573 (1980); *Mincey* v. *Arizona*, 437 U. S. 385 (1978); *Vale* v. *Louisiana*, 399 U. S. 30 (1970).   In fact, except for an aberrational warrantless "search incident to an arrest" exception recognized in *United States* v. *Rabinowitz*, 339 U. S. 56 (1950), and repudiated by *Chimel*, this rule has been settled since *Agnello* v. *United States*, 269 U. S. 20, 32–33 (1925).   See also *Trupiano* v. *United States*, 334 U. S. 699 (1948).

Nevertheless, in what I can only characterize as an astonishing holding, THE CHIEF JUSTICE, joined by JUSTICE O'CONNOR, concludes that the 18–20-hour seizure of the apartment was not unreasonable. He advances three reasons for that conclusion, none of which has any merit.

First, he seeks to justify the delay because "the officers focused first on the task of processing those whom they had arrested before turning to the task of securing the warrant." *Ante*, at 812. But there is no evidence that this task presented any difficulties; indeed, since the arrest of the occupants itself was unconstitutional, it is truly ironic that THE CHIEF JUSTICE uses one wrong to justify another. Of greater significance, the District Court expressly found that the length of the delay was unreasonable and that the Government had made no attempt to justify it; that finding was upheld by the Court of Appeals, and in this Court the Government expressly concedes that the delay was unreasonable.[17]

Second, THE CHIEF JUSTICE suggests that it is relevant that the officers did not act in "bad faith." *Ante*, at 798, 812. This is done despite the fact that there is no finding as to whether the agents acted in good or bad faith; the reason is that the litigants have never raised the issue. More impor-

---

[17] The only explanation the Government has offered for the delay is that most of February 13 was taken up with "processing" the arrests. Brief for United States 5, n. 4. At oral argument, the Government conceded that the delay was unreasonable. Tr. of Oral Arg. 27. At the suppression hearing in the District Court, one of the agents testified that the warrant application was not even presented to a Magistrate until 5 p. m. on February 13. He explained: "Well, it's very hard to get secretarial services today." Tr. 162–163. The Assistant United States Attorney responsible for procuring the warrant testified similarly. *Id.*, at 445. The attorney did not explain why he did not simply write out the two-page application by hand, or seek a telephonic warrant under Federal Rule of Criminal Procedure 41(c)(2). The District Court found that the delay was unreasonable, App. 15–16, a finding that the Court of Appeals did not disturb. The Government does not challenge that finding in this Court.

tant, this Court has repeatedly held that a police officer's good or bad faith in undertaking a search or seizure is irrelevant to its constitutional reasonableness,[18] and does so again today.[19]

Finally, and "most important" to his conclusion, THE CHIEF JUSTICE suggests that there was no significant interference with petitioners' possessory interests in their apartment because they were in custody anyway. *Ante*, at 813. The cases are legion holding that a citizen retains a protected possessory interest in his home and the effects within it which may not be infringed without a warrant even though that person is in custody. *Mincey* and *Chimel* are but two instances of that general rule—the defendants in both cases were in custody, yet both were held to have protected possessory interests in their homes and the effects within them that could not be infringed without a warrant. Even when a person is in custody after an arrest based on probable cause, he still, of course, owns his house and his right to exclude others—including federal narcotics agents—remains inviolate. What is even more strange about THE CHIEF JUSTICE's conclusion is that it permits the authorities to benefit from the fact that they had unlawfully arrested Colon. Colon was in her own home when she was arrested without a warrant. That was unconstitutional.[20] If the agents had decided to obey the Constitution and not arrest Colon, then she would not have "relinquished control" over the property and presumably it would have been unreasonable for the agents to have remained on the premises under THE CHIEF JUSTICE's analysis. However, because the agents conducted an unlawful arrest in addition to their pre-

---

[18] See *Terry* v. *Ohio*, 392 U. S., at 22; *Beck* v. *Ohio*, 379 U. S. 89, 97 (1964); *Henry* v. *United States*, 361 U. S. 98, 102 (1959).

[19] *United States* v. *Leon*, *post*, at 915, n. 13.

[20] *Welsh* v. *Wisconsin*, 466 U. S. 740 (1984); *Payton* v. *New York*, 445 U. S. 573 (1980).

vious unlawful entry, an otherwise unreasonable occupation becomes "reasonable." THE CHIEF JUSTICE's approach is as reasonable as was the agents' conduct. Only in that sense does it achieve its purpose.

Thus, on the basis of the record evidence and the findings of the District Court, it is clear that the 18–20-hour occupation of petitioners' apartment was a second independent violation of the Fourth Amendment. Not only was it the fruit of the initial illegal entry into that apartment, but it also constituted an unreasonable search and seizure of the apartment. The District Court concluded that both violations should be remedied by suppression of all of the evidence found in the apartment. The Court of Appeals agreed that suppression of the prewarrant evidence was the proper remedy for the first violation but prescribed no remedy for the second. THE CHIEF JUSTICE does not agree that there was a second violation, and the Court concludes that the unconstitutional conduct that did occur was neutralized by the ultimate issuance of a valid warrant. In reaching that conclusion the Court correctly recognizes that the law requires suppression of the evidence if it was "'"come at by exploitation of [the initial] illegality"'" instead of "'"by means sufficiently distinguishable to be purged of the primary taint."'" *Ante*, at 804–805 (quoting *Wong Sun* v. *United States*, 371 U. S. 471, 488 (1963)). The Court fails, however, to discuss the reason for that rule or how it should apply to the facts of this case.

### III

Every time a court holds that unconstitutionally obtained evidence may not be used in a criminal trial it is acutely aware of the social costs that such a holding entails.[21] Only

---

[21] Justice Holmes commented on this dilemma:

"[W]e must consider the two objects of desire, both of which we cannot have, and make up our minds which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should

the most compelling reason could justify the repeated imposition of such costs on society.   That reason, of course, is to prevent violations of the Constitution from occurring.[22]

As the Court has repeatedly stated, a principal purpose of the exclusionary rule is to deter violations of the Fourth Amendment.   See, *e. g.*, *Stone* v. *Powell*, 428 U. S. 465, 486 (1976); *United States* v. *Janis*, 428 U. S. 433, 446–447 (1976); *United States* v. *Peltier*, 422 U. S. 531, 536–539 (1975); *United States* v. *Calandra*, 414 U. S. 338, 347–348 (1974).

> "The rule is calculated to prevent, not to repair.   Its purpose is to deter—to compel respect for the constitu-

---

be used.   It also is desirable that the Government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained.   If it pays its officers for having got evidence by crime I do not see why it may not as well pay them for getting it in the same way, and I can attach no importance to protestations of disapproval if it knowingly accepts and pays and announces that in future it will pay for the fruits.   We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part."   *Olmstead* v. *United States*, 277 U. S. 438, 470 (1928) (dissenting opinion).

[22] Justice Stewart has written:

"[T]he Framers did not intend the Bill of Rights to be no more than unenforceable guiding principles—no more than a code of ethics under an honor system.   The proscriptions and guarantees in the amendments were intended to create legal rights and duties.

"The Bill of Rights is but one component of our legal system—the one that limits the government's reach.   The primary responsibility for enforcing the Constitution's limits on government, at least since the time of *Marbury* v. *Madison*, has been vested in the judicial branch.   In general, when law enforcement officials violate a person's Fourth Amendment rights, they do so in attempting to obtain evidence for use in criminal proceedings.   To give effect to the Constitution's prohibition against illegal searches and seizures, it may be necessary for the judiciary to remove the incentive for violating it.   Thus, it may be argued that although the Constitution does not explicitly provide for exclusion, the need to enforce the Constitution's limits on government—to preserve the rule of law—requires an exclusionary rule."   Stewart, The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule, 83 Colum. L. Rev. 1365, 1383–1384 (1983) (footnotes omitted).

tional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins* v. *United States*, 364 U. S. 206, 217 (1960).

The deterrence rationale for the exclusionary rule sometimes, but not always, requires that it be applied to the indirect consequences of a constitutional violation. If the government could utilize evidence obtained through exploitation of illegal conduct, it would retain an incentive to engage in that conduct. "To forbid the direct use of methods thus characterized [as illegal] but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.'" *Nardone* v. *United States*, 308 U. S. 338, 340 (1939).

We have not, however, mechanically applied the rule to every item of evidence that has a causal connection with police misconduct. "The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown* v. *Illinois*, 422 U. S. 590, 609 (1975) (POWELL, J., concurring in part).[23]

This point is well illustrated by our cases concerning the use of confessions obtained as the result of unlawful arrests. In *Wong Sun* v. *United States*, 371 U. S. 471 (1963), we rejected a rule that any evidence that would not have been obtained but for the illegal actions of the police should be suppressed. See *id.*, at 487–488, 491. Yet in *Brown* v. *Illinois*, 422 U. S. 590 (1975), while continuing to reject a "but-for" rule, see *id.*, at 603, we held that the taint of an unlawful arrest could not be purged merely by warning the arrestee of his right to remain silent and to consult with

---

[23] See 3 W. LaFave, Search and Seizure § 11.4(a) (1978); Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U. Pa. L. Rev. 378, 388–390 (1964); Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif. L. Rev. 579, 586–589 (1968).

counsel as required by *Miranda* v. *Arizona*, 384 U. S. 436 (1966). We explained:

> "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.'" 422 U. S., at 602–603 (citation and footnote omitted).

These holdings make it clear that taint questions do not depend merely on questions of causation; causation is a necessary but not a sufficient condition for exclusion. In addition, it must be shown that exclusion is required to remove the incentive for the police to engage in the unlawful conduct. When it is, exclusion is mandated if the Fourth Amendment is to be more than "a form of words."

## IV

The Court concludes that the evidence introduced against petitioners at trial was obtained from a source that was "independent" of the prior illegality—the search warrant. The Court explains that since the police had a legal basis for obtaining and executing the search warrant, the fruits of the authorized search were not produced by exploitation of the prior illegality. *Ante*, at 814–815. There are significant analytical difficulties lurking in the Court's approach. First, the Court accepts the distinction between the evidence

obtained pursuant to the warrant and the evidence obtained during the initial illegal entry. *Ante*, at 814; see also *ante*, at 812 (opinion of BURGER, C. J.). I would not draw a distinction between the prewarrant evidence and the post-warrant evidence. The warrant embraced both categories equally and if there had been no unlawful entry, there is no more reason to believe that the evidence in plain view would have remained in the apartment and would have been obtained when the warrant was executed than the evidence that was concealed. The warrant provided an "independent" justification for seizing all the evidence in the apartment—that in plain view just as much as the items that were concealed. The "plain view" items were not actually removed from the apartment until the warrant was executed;[24] thus there was no more interference with petitioners' possessory interest in those items than with their interest in the concealed items. If the execution of a valid warrant takes the poison out of the hidden fruit, I should think that it would also remove the taint from the fruit in plain view.[25]

Second, the Court's holding is inadequate to resolve the claims raised by petitioners. The Court states that the fruits of the judicially authorized search were untainted because "[n]o information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant." *Ante*, at 814. That is sufficient to dispose only of a claim that petitioners do not make—that the information which led to the issuance of the search warrant was tainted. It does not dispose of the claim that

---

[24] Tr. 259.

[25] I recognize that the legality of the seizure of the evidence that was in plain view when the officers entered is not before us, but I find it necessary to discuss it since it affects the analysis of the issue that is in dispute. THE CHIEF JUSTICE does so as well; he relies on the deterrent effect of the suppression of the evidence found in plain view in responding to petitioners' argument that the Court of Appeals' decision will encourage illegal entries in the course of securing premises from the inside. *Ante*, at 812.

petitioners do make—that the agents' *access* to the fruits of the authorized search, rather than the *information* which led to that search, was a product of illegal conduct. On this question, the length of the delay in obtaining the warrant is surely relevant.

If *Segura* had not returned home at all that night, or during the next day, it is probable that the occupants of the apartment would have become concerned and might at least have destroyed the records of their illegal transactions, or removed some of the evidence. If one of the occupants had left the apartment and taken evidence with him or her during the 18–20-hour period prior to the execution of the search warrant, then obviously that evidence would not have been accessible to the agents when the warrant finally was executed.[26] The District Court concluded that there was a possibility that the evidence's availability when the warrant was executed hinged solely on the illegal impoundment. It found: "The evidence would not inevitably have been discovered. In fact, Colon might well have destroyed the evidence had she not been illegally excluded [from the apartment]." App. 15. This finding indicates that there is substantial doubt as to whether all of the evidence that was actually seized would have been discovered if there had been no illegal entry and occupation.

The majority insists that the idea that access to evidence is a relevant consideration is "unsound" because it would "extend" the exclusionary rule and "further 'protect' criminal activity," *ante*, at 816. However, this very point is far from

---

[26] It is by no means impossible that at least one of the occupants might have been able to leave the apartment. None of them was known to the agents, and if the agents were located outside the apartment building, they would not have known that a person leaving the building would have come from petitioners' apartment. There were quite a few apartments on each floor of the apartment building. Tr. 253. Moreover, as the District Court noted, the agents could not see petitioners' apartment from their position in the front of the building.

novel; it actually has been the long-settled rule. It is implicit in virtually every case in which we have applied the exclusionary rule. In the seminal case, *Weeks* v. *United States*, 232 U. S. 383 (1914), federal agents illegally entered Weeks' house and seized evidence. The Court ordered the evidence suppressed precisely because absent the illegality, the agents would never have obtained access to the evidence. See *id.*, at 393–394. More recently, in *Payton* v. *New York*, 445 U. S. 573 (1980), we held that suppression was required because the agents were not authorized to enter the house; it was the Fourth Amendment violation that enabled them to obtain access to the evidence. Indeed, we have regularly invoked the exclusionary rule because the evidence would have eluded the police absent the illegality.[27] Here, too, if the evidence would not have been available to the agents at the time they finally executed the warrant had they not illegally entered and impounded petitioners' apartment, then it cannot be said that the agents' access to the evidence was "independent" of the prior illegality.

The unlawful delay provides the same justification for suppression as does the unlawful entry: both violations precluded the possibility that evidence would have been moved out of the reach of the agents. We approved of exactly that principle only last Term, in *United States* v. *Place*, 462 U. S. 696 (1983). There, luggage was detained for some 90 minutes until a trained narcotics detection dog arrived. The dog then sniffed the luggage, signaled the presence of narcotics, a

---

[27] The element of access, rather than information, is central to virtually the whole of our jurisprudence under the Warrant Clause of the Fourth Amendment. In all of our cases suppressing evidence because it was obtained pursuant to a warrantless search, we have focused not on the authorities' lack of appropriate information to authorize the search, but rather on the fact that that information was not presented to a magistrate. Thus, suppression is the consequence not of a lack of information, but of the fact that the authorities' access to the evidence in question was not properly authorized and hence was unconstitutional.

warrant was obtained on the strength of the dog's reaction, and when the warrant was executed, narcotics were discovered. The Court held that while the initial seizure was lawful, it became unreasonable because of its duration. Thus, absent the illegality, the authorities would have had to give the luggage back to Place, who would have then taken it away.[28]  *The evidence was obtained in violation of the Fourth Amendment because it was the unlawful delay that prevented the evidence from disappearing before it could be obtained by the authorities.*  That is precisely the claim made by petitioners here.

When it finally does confront petitioners' claim concerning the relationship between the unlawful occupation of their apartment and the evidence obtained at the conclusion of that occupation, *ante*, at 815–816, the Court rejects it for two reasons.  First, it finds the possibility that the evidence would not have been in the apartment had it not been impounded to be speculative.  However, the District Court found a distinct, nonspeculative possibility that the evidence would not have been available to the police had they not entered the apartment illegally.  The Court is obligated to respect that finding unless found to be clearly erroneous, which it is not.  Indeed, it is equally speculative to assume that the occupants of the apartment would not have become concerned enough to take some action had Segura been missing for 18–20 hours.[29]  Second, the Court thinks it "prudentially unsound"

---

[28] Even more recently, in *Welsh* v. *Wisconsin*, 466 U. S. 740 (1984), we again employed this concept.  The Court held that police could not justify under the Fourth Amendment the warrantless arrest of Welsh, who was suspected of drunken driving, in his own home, "simply because evidence of the petitioner's blood-alcohol level might have dissipated while the police obtained a warrant."  *Id.*, at 754 (footnote omitted).

[29] The Court of Appeals, with which this Court agrees, noted that the District Court's ruling depended on "speculative assumptions," such as that the agents would not have kept the apartment under surveillance after Segura's arrest had they not illegally entered it, that Colon would have

to suppress the evidence, noting a certain irony in extending the protection of the Constitution simply because criminals may destroy evidence if given the chance. This analysis confuses two separate issues however: (1) whether the initial entry was justified by exigent circumstances; and (2) whether the discovery of the evidence can be characterized as "inevitable" notwithstanding the 18-hour delay. There is no dispute that the risk of *immediate* destruction did not justify the entry. The argument petitioners make is not that there was some immediate threat of destruction of evidence, but that there was a substantial possibility that over the course of 18–20 hours at least some of the evidence would have been removed or destroyed.[30]

---

destroyed the evidence rather than merely removed it from the apartment, or that the evidence could have been destroyed unobtrusively. However, each of these "assumptions" is supported by the evidence. First, the agents would have had no reason to keep the apartment under surveillance subsequent to the arrests of all the persons that they had surveilled, Parra, Rivudalla-Vidal, and Segura. Second, even if Colon had merely removed the evidence from the apartment, there is reason to believe the agents would not have intercepted her. See n. 26, *supra*. Third, since the agents were outside the apartment and would have had no reason to remain on the scene after Segura's arrest, they would not have been around to notice had evidence been removed or destroyed unobtrusively. Moreover, even if it would have been difficult to remove or destroy some of the evidence, such as the triple-beam scale petitioners owned, that does not mean that all of the evidence would have remained in the apartment over the course of an 18–20-hour period. The Court of Appeals' assumptions to the contrary are just as "speculative" as the finding of the District Court.

[30] The cases in the lower courts the majority cites in support of its holding, *ante*, at 814, n. 9, are plainly distinguishable. In *United States* v. *Perez*, 700 F. 2d 1232, 1237–1238 (CA8 1983), the court remanded for a hearing as to whether the search and seizure authorized by a warrant was tainted by prior illegality. In *United States* v. *Kinney*, 638 F. 2d 941, 945 (CA6), cert. denied, 452 U. S. 918 (1981), the court found no taint, but in that case there was no occupation of the searched premises prior to obtaining the warrant and hence no claim of the type made here. The same is true of the other cases the Court cites, *United States* v. *Bosby*, 675 F. 2d

For me, however, the controlling question should not be answered merely on the basis of such speculation, but rather by asking whether the deterrent purposes of the exclusionary rule would be served or undermined by suppression of this evidence. That is the appropriate "prudential" consideration identified in our exclusionary rule cases. The District Court found that there was a distinct possibility that the evidence was preserved only through an illegal occupation of petitioners' apartment. That possibility provides a sufficient reason for asking whether the deterrent rationale of the exclusionary rule is applicable to the second constitutional violation committed by the police in this case.

## V

The importance of applying the exclusionary rule to the police conduct in this case is underscored by its facts. The 18–20-hour occupation of petitioners' home was blatantly unconstitutional. At the same time, the law enforcement justification for engaging in such conduct is exceedingly weak. There can be no justification for inordinate delay in securing a warrant. Thus, applying the exclusionary rule to such conduct would impair no legitimate interest in law enforcement. Moreover, the deterrence rationale of the rule is plainly applicable. The agents impounded this apartment precisely because they wished to avoid risking a loss of access to the evidence within it. Thus, the unlawful benefit they acquired through the impoundment was not so "attenuated" as to make it unlikely that the deprivation of that benefit through the exclusionary rule would have a deterrent effect. To the contrary, it was exactly the benefit identified by the District

1174, 1180–1181 (CA11 1982); *United States* v. *Fitzharris*, 633 F. 2d 416 (CA5 1980), cert. denied, 451 U. S. 988 (1981); *United States* v. *Agapito*, 620 F. 2d 324, 338 (CA2), cert. denied, 449 U. S. 834 (1980). As the Court concedes, *United States* v. *Lomas*, 706 F. 2d 886 (CA9 1983), and *United States* v. *Allard*, 634 F. 2d 1182 (CA9 1980), are contrary to its holding.

Court—avoiding a risk of loss of evidence—that motivated the agents in this case to violate the Constitution. Thus, the policies underlying the exclusionary rule demand that some deterrent be created to this kind of unconstitutional conduct. Yet the majority's disposition of this case creates none. Under the majority's approach, the agents could have remained indefinitely—impounding the apartment for a week or a month—without being deprived of the advantage derived from the unlawful impoundment. We cannot expect such an approach to prevent similar violations of the Fourth Amendment in the future.

In my opinion the exclusionary rule should be applied to both of the constitutional violations to deprive the authorities of the advantage they gained as a result of their unconstitutional entry and impoundment of petitioners' apartment. The deterrence rationale of the exclusionary rule requires suppression unless the Government can prove that the evidence in fact would have remained in the apartment had it not been unlawfully impounded. The risk of uncertainty as to what would have happened absent the illegal conduct posed by the facts of this case should be borne by the party that created that uncertainty, the Government. That is the teaching of our exclusionary rule cases. See *Taylor* v. *Alabama*, 457 U. S. 687, 690 (1982); *Dunaway* v. *New York*, 442 U. S. 200, 218 (1979); *Brown* v. *Illinois*, 422 U. S., at 604.

Further proceedings are necessary in this case if petitioners' claim is to be properly evaluated. The District Court found only that there was a demonstrable possibility that the evidence obtained during the execution of the search warrant would have been destroyed absent the illegal entry and impoundment. While this finding is sufficient to establish prima facie that the Government exploited the illegality by avoiding a risk of losing the evidence in the apartment, the existence of a mere possibility cannot be equated with an ultimate finding that such exploitation did in fact occur. The

District Court made no specific finding as to whether the Government had demonstrated that the evidence obtained pursuant to the search warrant would have remained in the apartment had the agents not illegally entered and impounded it. It may be that an evidentiary hearing would be necessary to supplement the record on this point. Accordingly, I would remand this case to the Court of Appeals with instructions that it be remanded to the District Court for further proceedings.

## VI

The Government did not contest the blatant unconstitutionality of the agents' conduct in this case. Nevertheless, today's holding permits federal agents to benefit from that conduct by avoiding the risk that evidence would be unavailable when the search warrant was finally executed. The majority's invocation of the "enormous price" of the exclusionary rule and its stated unwillingess to "protect criminal activity," *ante*, at 816, is the most persuasive support that the Court provides for its holding. Of course, the Court is quite right to be ever mindful of the cost of excessive attention to procedural safeguards. But an evenhanded approach to difficult cases like this requires attention to countervailing considerations as well. There are two that I would stress.

First, we should consider the impact of the Court's holding on the leaders of the law enforcement community who have achieved great success in creating the kind of trained, professional officers who deservedly command the respect of the communities they serve. The image of the "keystone cop" whose skills seldom transcended the ham-handed employment of the "third degree" is largely a matter of memory for those of us who lived through the 1920's, 1930's and 1940's. For a congeries of reasons, among which unquestionably is the added respect for the constitutional rights of the individual engendered by cases like *Miranda* v. *Arizona*, 384 U. S. 436 (1966), and *Mapp* v. *Ohio*, 367 U. S. 643 (1961), the professionalism that has always characterized the Federal

Bureau of Investigation is now typical of police forces throughout the land. A rule of law that is predicated on the absurd notion that a police officer does not have the skill required to obtain a valid search warrant in less than 18 or 20 hours, or that fails to deter the authorities from delaying unreasonably their attempt to obtain a warrant after they have entered a home, is demeaning to law enforcement and can only encourage sloppy, undisciplined procedures.

Second, the Court's rhetoric cannot disguise the fact that when it not only tolerates but also provides an affirmative incentive for warrantless and plainly unreasonable and unnecessary intrusions into the home, the resulting erosion of the sanctity of the home is a "price" paid by the innocent and guilty alike.[31] More than half a century ago, Justice Holmes explained why the Government cannot be permitted to benefit from its violations of the Constitution.

> "The Government now, while in form repudiating and condemning the illegal seizure, seeks to maintain its right to avail itself of the knowledge obtained by that means which otherwise it would not have had.

---

[31] The words that this case calls to my mind are not those of *Nardone*, *ante*, at 816, but rather those in two of Justice Jackson's dissents. With respect to the claim that the Fourth Amendment "protect[s] criminal activity," he wrote: "Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. . . . Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty. . . . So a search against Brinegar's car must be regarded as a search of the car of Everyman." *Brinegar* v. *United States*, 338 U. S. 160, 181 (1949). And with respect to the "price" exacted by the exclusionary rule, he wrote: "[T]he forefathers thought this was not too great a price to pay for that decent privacy of home, papers and effects which is indispensable to individual dignity and self-respect. They may have overvalued privacy, but I am not disposed to set their command at naught." *Harris* v. *United States*, 331 U. S. 145, 198 (1947).

"The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, . . . the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act. . . . In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 391–392 (1920) (citation omitted).

If we are to give more than lipservice to protection of the core constitutional interests that were twice violated in this case, some effort must be made to isolate and then remove the advantages the Government derived from its illegal conduct.

I respectfully dissent.