# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 5, 2003 Session

## STATE OF TENNESSEE v. WILLIAM TIMOTHY CARTER AND VIRGINIA DARLEAN CARTER

**Direct Appeal from the Circuit Court for Carroll County**
**No. 02CR-1813     C. Creed McGinley, Judge**

---

**No. W2002-00947-CCA-R3-CD  - Filed September 24, 2003**

---

This is a State appeal.  The grand jury indicted the Defendants, William Timothy Carter and Virginia Darlean Carter,[1] on several counts relating to the manufacture and possession of various drugs and the possession of drug paraphernalia.  The trial court granted the Defendants' motion to suppress evidence based upon an illegal residential search.  On appeal, the State contends the trial court erred in granting the Defendants' motion to suppress.  We conclude that even if the officers made an unlawful entry into the residence, the evidence was subsequently seized pursuant to a valid search warrant which was not based upon any observations made during the alleged unlawful entry.  Because the independent source doctrine applies, the seizure of evidence was proper.  Accordingly, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; G. Robert Radford, District Attorney General; and Eleanor Cahill, Assistant District Attorney General, for the appellant, State of Tennessee.

Benjamin S. Dempsey, Huntingdon, Tennessee, for the appellees, William Timothy Carter and Virginia Darlean Carter.

## OPINION
### I.  Suppression Hearing

Deputy Michael Verner of the Carroll County Sheriff's Department testified that on September 15, 2001, between 10:00 and 10:30 p.m., the sheriff's department received an anonymous

---

[1]Virginia "Darlean" Carter's name is also spelled Virginia "Darlene" Carter in some of the pleadings.

call complaining of a smell of ammonia in the area of the Defendants' residence. Deputy Verner stated he and Deputy Timothy Megs drove separate vehicles to the area, which was located approximately fifteen to twenty miles from the sheriff's department. The deputy further stated that upon arriving in the area, he smelled the odor of anhydrous ammonia from the roadway.

Deputy Verner testified that upon detecting the odor, he and Deputy Megs drove up to the Defendants' residence. Deputy Megs approached the front door of the residence, while Deputy Verner approached the back door. Deputy Verner stated that although Deputy Megs knocked on the front door and announced his presence, no one opened the door. He stated he then began knocking on the back door and announced his presence. Deputy Verner testified the back door then "came open," and he observed an individual run into the bathroom. The deputy stated he did not force the door open. He further stated that when the door opened, he heard a female voice say, "Come in," and he entered the residence.

Deputy Verner testified that upon entering the residence, he walked through the kitchen to the front door. He stated he did not observe any incriminating items. The deputy then instructed the Defendants to unlock the front door and allow Deputy Megs to enter the residence, and the Defendants complied. Deputy Verner testified that upon questioning the Defendants regarding the odor of ammonia, they stated the odor was not coming from their residence. The deputy stated he requested consent to search the residence, and the Defendants refused.

Deputy Verner testified that although the Defendants and another individual were inside the residence, no one was arrested at that time. The deputy stated that after the Defendants informed him that no one else was inside the residence, he escorted the Defendants and the third individual to the front porch and detained them while Deputy Megs obtained a search warrant. Deputy Verner further stated the Defendants were not permitted to leave the premises nor reenter the residence without an officer accompanying them.

Deputy Verner testified Deputy Megs left to obtain a search warrant. He stated he did not search the residence until Deputy Megs returned with the search warrant. During the execution of the search warrant, Deputy Verner found the contraband subject to the indictment. After the search was completed, the defendants were arrested.

Deputy Timothy Megs testified that on September 15, 2001, at approximately 11:00 p.m., the sheriff's department received an anonymous call complaining of methamphetamine being manufactured at the Defendants' residence. Deputy Megs stated he and Deputy Verner drove by the residence and smelled a "strong" odor of anhydrous ammonia and ether from the roadway. He further stated he had completed training regarding methamphetamine and opined that anhydrous ammonia is generally used to manufacture methamphetamine.

Deputy Megs testified he and Deputy Verner then drove up to the Defendants' residence, and when he opened the door of his vehicle, he observed someone inside the residence peer out of the window. The deputy stated that when he exited his vehicle, he heard people running inside of the

residence. Deputy Megs then approached the front door, while Deputy Verner approached the back door. Deputy Megs testified he knocked on the front door and announced his presence. He stated that while knocking on the door, he heard movements inside the residence. The deputy further stated that after several minutes, Defendant William Carter opened the door.

Deputy Megs testified Deputy Verner entered the residence through the back door. He stated that while he was on the front porch, he did not hear anyone strike the back door nor did he hear the Defendants invite him or anyone else to enter the residence. Deputy Megs testified that upon entering the residence, he walked into the living room but did not observe any incriminating items. Upon explaining his presence at the residence, the deputy requested the Defendants' permission to search the residence; they refused.

Deputy Megs stated a third individual was present at the residence, and he questioned the Defendants regarding the presence of any other individuals. When the Defendants informed the deputies that no one else was inside the residence, the deputies escorted the Defendants and the third individual to the front porch. Deputy Megs testified that although the Defendants were not arrested at that time, they were not free to leave the premises nor could they reenter the residence unaccompanied by an officer. The deputy stated he then left the residence to obtain a search warrant. Deputy Megs testified that while executing the search warrant, he and other officers discovered marijuana, methamphetamine, and precursors used to manufacture methamphetamine.

Defendant Virginia Carter testified that while she was in her kitchen, she heard someone knocking on her back door, and the door then opened. She stated that although she did not know how the door was opened, she observed a footprint on the door, and the door appeared to have been kicked open. She further stated the door was not damaged prior to the deputies' arrival.

Defendant Virginia Carter testified Deputy Verner entered the residence through the back door with his gun drawn and said, "If I don't start seeing hands, I'm going to start firing." She stated that while the deputy was knocking, she did not hear him identify himself as a law enforcement officer. She also denied giving Deputy Verner permission to enter the residence.

## II. Trial Court's Findings

The trial court found that while the deputies were driving on the roadway in response to an anonymous tip, they smelled the "very distinct" odor of byproducts of manufactured methamphetamine. The court noted that based on their training and experience, the officers believed the odor was consistent with the manufacture of methamphetamine. The trial court found the deputies' personal observations from the roadway established probable cause that criminal activity was occurring at that moment, which would have supported the issuance of a search warrant.

The trial court noted that instead of obtaining a search warrant, one deputy approached the front door of the residence, while another deputy approached the back door. The court found neither deputy was invited to enter the residence and they entered without consent. The trial court noted the

Defendants were not alerted to anything which might have caused them to dispose of any illegal drugs or contraband until the deputies approached the residence and began the raid. The court found there were no exigent circumstances except "those created by [the deputies] approaching the home at that time." The trial court then granted the Defendants' motion to suppress evidence obtained as a result of the illegal search.

## III. Standard of Review

The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). However, this court is not bound by the trial court's conclusions of law. State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

In this case, the evidence does not preponderate against the findings of fact by the trial court. Specifically, the evidence supports the finding that the officers smelled the odor of methamphetamine byproducts from the roadway; thus, the trial court properly concluded as a matter of law that the officers had probable cause to believe illegal activities were afoot and a proper basis to secure a search warrant. The evidence further supports the trial court's finding that the officers, nevertheless, proceeded to the residence; they observed nothing to indicate the possible destruction of contraband until they approached the residence; and they entered the residence without consent. However, we review the trial court's conclusion of law that the evidence was illegally seized under a *de novo* standard without a presumption of correctness. Daniel, 12 S.W.3d at 423. Based upon our review, we conclude the trial court's determination was in error.

## IV. Warrantless Entry

The State contends the trial court erred in finding the warrantless entry into the Defendants' residence was unlawful. Specifically, the State argues probable cause and exigent circumstances existed, thus permitting the warrantless entry.

Both the Fourth Amendment of the United States Constitution and Article I, Section 7 of the Tennessee Constitution prohibit "unreasonable searches and seizures." The purpose and intent of Article I, Section 7 is identical with that of the Fourth Amendment, which is to "safeguard the privacy and security of individuals against the arbitrary invasions of government officials." Randolph, 74 S.W.3d at 334 (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967)); State v. Gonzalez, 52 S.W.3d 90, 95 (Tenn. Crim. App. 2000).

A warrantless search is presumed unreasonable under both the federal and state constitutions, and evidence seized from the warrantless search is subject to suppression unless the state demonstrates by a preponderance of the evidence that the search was "conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998); see Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). Probable cause and exigent circumstances must exist in order to justify an officer's warrantless entry into a private residence. Kirk v. Louisiana, 536 U.S. 635, 638, 122 S. Ct. 2458, 153 L. Ed. 2d 599 (2002). Exigent circumstances may occur in three situations: "(1) when officers are in 'hot pursuit' of a fleeing suspect; (2) when the suspect presents an immediate threat to the arresting officers or the public; or (3) when immediate police action is necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." State v. Steven Lloyd Givens, No. M2001-00021-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 920, at *10 (Tenn. Crim. App. Nov. 29, 2001, at Nashville) (citing Jones v. Lewis, 874 F.2d 1125, 1130 (6th Cir. 1989), cert. denied, 506 U.S. 841 (1992)), perm. to app. denied (Tenn. 2002). The State bears the burden of demonstrating "exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984).

In granting the Defendants' motion to suppress, the trial court found the deputies, although having probable cause to believe contraband was present, created the exigent circumstances when they approached the Defendants' residence, thus alerting the Defendants to their presence. Various courts have held that exigent circumstances, which would justify a warrantless entry, may not be created by the government's actions. See, e.g., United States v. Haddix, 239 F.3d 766, 767-68 (6th Cir. 2001) (noting police officers may not create exigent circumstances to justify warrantless intrusions); United States v. Richard, 994 F.2d 244, 249 (5th Cir. 1993) (holding that officers improperly created the exigency when they announced their presence as "warrantless entry became a foregone conclusion once officers knocked"); United States v. Munoz-Guerra, 788 F.2d 295, 298 (5th Cir. 1986) (concluding warrantless entry was improper where officers created the exigency by knocking on the door and announcing their presence without a reason to believe the suspect had prior knowledge of police surveillance); Hornblower v. State, 351 So. 2d 716, 718 (Fla. 1977) (concluding "[t]he suspicious movement which occurred when the police announced their presence cannot supply the exigent circumstances to justify the warrantless search"); Dunnuck v. State, 786 A.2d 695, 704-05 (Md. 2001) (noting the officers improperly created the exigency by knocking on the defendant's door and alerting him to their investigation); State v. Williams, 615 N.E.2d 487, 488-89 (Ind. Ct. App. 1993) (holding that the police officers, who had probable cause to believe drugs were present inside the defendant's residence, improperly created the "emergency" by knocking on the door); see also State v. Hendrix, 782 S.W.2d 833, 835 (Tenn. 1989) (recognizing the doctrine relating to officers' creating exigent circumstances but not applying the doctrine in the case as the officers did not make a warrantless entry or search the premises). Regardless, we note that no incriminating evidence was discovered or seized as a result of the alleged unlawful entry. Thus, the alleged unlawful entry is not determinative of the propriety of the subsequent seizure of evidence.

## V. Detention of the Defendants

Deputy Verner testified that upon entering the residence, he escorted the Defendants to the front porch and detained them while Deputy Megs obtained a search warrant. Generally, a suspect may be temporarily detained outside his or her residence and prevented from entering the residence unaccompanied by a police officer for a reasonable time while the police obtain a search warrant. See Illinois v. McArthur, 531 U.S. 326, 331-33, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001).

In the present case, the deputies testified that between 10:00 and 11:00 p.m., they received a complaint regarding an odor of ammonia in the area of the Defendants' residence. Upon securing the residence and detaining the occupants, Deputy Megs then returned to the sheriff's department, located fifteen to twenty miles away from the residence, in order to obtain a search warrant. The search warrant was typed, and it was ultimately signed by the magistrate at 1:09 a.m. It was executed shortly thereafter. Considering the time of night, the distance of travel to secure a warrant, the drafting of the warrant, and the securing of a magistrate to approve the warrant, we conclude this period of time was "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." Id. at 332.

Because we have concluded the length of detention was not unreasonable, the Defendants can only argue that the detention was illegal solely because of the alleged unlawful entry. However, we note that no incriminating evidence was obtained during the entry or detention. Therefore, the only remaining argument for suppression of the evidence subsequently seized pursuant to the search warrant would have to be based upon the fact that the Defendants could have destroyed the contraband had they not been detained by the officers.[2] This argument "defies both logic and common sense" and has been rejected by the United States Supreme Court. Segura v. United States, 468 U.S. 796, 816, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984) (concluding the exclusionary rule should not be expanded to "further 'protect' criminal activity").

Because there was no seizure during the entry or detention, the Defendants are not entitled to relief on this issue.

## VI. Independent Source Doctrine

The State contends that even if the initial warrantless entry and detention were unlawful, the challenged evidence was not the fruit of the unlawful entry or detention; instead, the evidence was properly seized as a result of a valid search warrant. We agree.

---

[2]The State in its brief notes that "had the Defendants affirmatively testified that, absent the decision of the officers to secure the premises, they would have destroyed the evidence," the Defendants might show the unlawful detention resulted in the subsequent discovery of the contraband. It cites McArthur, 531 U.S. at 329. However, this reference in McArthur was to the actions of the state courts, which were reversed. Id.

## A. Exclusionary Rule and the Independent Source Doctrine

The exclusionary rule may bar the admissibility of evidence which was obtained either directly or derivatively from an unconstitutional search or seizure. See Wong Sun v. United States, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). However, the exclusionary rule does not apply to evidence obtained by means independent of the constitutional violation. Id. at 487. Rather, the underlying policy of the "independent source doctrine" is that "'while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied.'" State v. Clark, 844 S.W.2d 597, 600 (Tenn. 1992) (quoting Murray v. United States, 487 U.S. 533, 542, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988)).

Pursuant to the independent source doctrine, "an unconstitutional entry does not compel exclusion of evidence found within a home if that evidence is subsequently discovered after execution of a valid warrant obtained on the basis of facts known entirely independent and separate from those discovered as a result of the illegal entry." Clark, 844 S.W.2d at 600 (citing Segura, 468 U.S. at 813-14). In order for evidence discovered during the execution of the subsequent search warrant to be found independent of the prior unconstitutional entry, information obtained during the unlawful entry must not have been presented to the issuing magistrate. Clark, 844 S.W.2d at 600.

## B. Search Warrant

In the case at bar, the search warrant affidavit executed by Deputy Megs set forth the following grounds:

> On 9/15/01 the Carroll County Sheriff[']s Department received an anonymous call that someone was cooking me[th]amphetamine at 7200 Hwy 190 in Carroll County. Your affiant then drove by 7200 Hwy 190 in Carroll County and did smell ether coming from the area of 7200 Hwy 190. Your affiant then approached the doorway of 7200 Hwy 190 and did notice the smell of ether and anhydrous ammonia coming from inside the residence and was able to hear several people running around inside the house. Your affiant has had considerable experience in working with methamphetamine labs and knows what he had observed to be consistent with the operation of a methamphetamine lab.

Upon examining the affidavit, we conclude the affidavit did not refer to the deputy's observations during the warrantless entry into the Defendants' residence. The Defendants maintain the deputy's observations, which he represented was consistent with the operation of a methamphetamine lab, occurred during the warrantless entry. However, both deputies testified they did not observe any incriminating evidence during the warrantless entry. Furthermore, the affidavit on its face does not contain any information indicating these observations were made while the deputy was inside the residence. Thus, we reject the Defendants argument that the affidavit contained false information. See State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978) (discussing the impeachment of a search warrant affidavit containing false statements).

We further note that the deputy's observations while he was approaching the residence and standing at the front door were not unlawful.[3] Our courts have held that a person does not have an expectation of privacy "in the area in the front of his residence which leads from the public way to the front door." State v. Baker, 625 S.W.2d 724, 727 (Tenn. Crim. App. 1981), overruled on other grounds, State v. Holt, 691 S.W.2d 520, 522 (Tenn. 1984); see also McArthur, 531 U.S. at 335 (noting that "a person standing in the doorway of a house is 'in a public place,' and hence subject to arrest without a warrant permitting entry of the home"). A sidewalk or pathway leading from a public street to the front door of a residence represents an "implied invitation" to the public to use the pathway in pursuing legitimate business or social interests with those inside the residence. State v. Harris, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995). Police officers, who are conducting official police business, are considered members of the general public. Id. at 623-24. Therefore, Deputy Megs's observations while approaching the front of the residence and standing on the front porch do not constitute information obtained as a result of a warrantless *entry* into the residence and could properly be considered by the magistrate in issuing the search warrant. Although Deputy Verner exceeded the scope of a "public place" by walking to the rear of the house and approaching the door, the affidavit did not mention or rely upon any observations by Deputy Verner.

The two deputies did not observe any incriminating evidence during the warrantless entry, and the Defendants made no incriminating statements during their detention. Rather, the contraband was discovered during the execution of a valid search warrant obtained on the basis of information entirely independent from any information discovered as a result of the initial warrantless entry or detention. See Segura, 468 U.S. at 814-15 (holding that drugs seized during execution of a valid search warrant were admissible, even though the officers had unlawfully entered the residence and occupied it for nineteen hours prior to obtaining the search warrant); State v. William D. Ware and Virginia Ware, No. 01C01-9803-CC-00129, 1999 Tenn. Crim. App. LEXIS 580, at *16 (Tenn. Crim. App. June 11, 1999, at Nashville), perm. to app. denied (Tenn. 1999). "Had police never entered the [premises], but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here." Segura, 468 U.S. at 814. In this regard, the trial court properly found the officers had probable cause to secure a search warrant. As a result, the evidence seized from the Defendants' residence during the execution of the search warrant was admissible pursuant to the independent source doctrine.

## VI. Conclusion

In summary, we conclude that even if the warrantless entry into the residence and the detainment of the Defendants were unlawful, the evidence seized during the execution of the search warrant was admissible pursuant to the independent source doctrine. Therefore, the trial court erred

---

[3]This is true even though approaching the front door arguably could not support exigent circumstances authorizing a warrantless entry, as previously discussed.

-8-

in granting the Defendants' motion to suppress. Accordingly, we reverse the judgment of the trial court and remand for further proceedings.

_____

ROBERT W. WEDEMEYER, JUDGE